[Crim. No. 5512. In Bank. May 28, 1954.]

THE PEOPLE, Respondent, v. LEONARD J. BALDWIN, Appellant.

Charles E. Ward, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant pleaded not guilty to a charge of the murder of Jack Arnold. At the trial the evidence included confessions which defendant claims were coerced. A jury found him guilty of murder of the first degree, and defendant appeals from the ensuing judgment which imposes the death penalty and from an order denying his motion for a new trial. We have concluded that the record shows no miscarriage of justice and that the judgment and the order denying defendant's motion for new trial should be affirmed.

*Facts Educed at the Trial*

Defendant arrived in Barstow, California, on January 28, 1953. He went to Judge Art Manning, a justice of the peace and former deputy sheriff whom defendant had known for about three years, and asked assistance in establishing himself in the community. Judge Manning permitted defendant to stay at the Manning ranch, furnished him with food, and aided him to obtain employment at another ranch.

On the morning of February 2, 1953, before defendant's employment at the other ranch was to begin, Judge and Mrs. Manning as usual went to their respective places of employment, leaving defendant alone at the ranch. Defendant then put the following property of Manning into Manning's pickup truck: a deputy sheriff's field jacket and badge, handcuffs, a bag containing coins, a .38 calibre Smith and Wesson special revolver, a .45 calibre Smith and Wesson revolver, a .45 calibre Army Colt, boxes of .38 and .45 calibre ammunition, and two submachine guns. Defendant drove the truck east from Barstow on Highway 91 for several miles, then the truck "gave out." Defendant, wearing the deputy sheriff's jacket and badge, signaled to the driver of a passing station wagon. This driver was Jack Arnold, who was a stranger to defendant but

a friend of Judge Manning. Arnold stopped; defendant represented that he was a deputy sheriff; and at defendant's request Arnold permitted defendant to ride with him.

Arnold was not seen again by any witness except defendant until February 5, when deputy sheriffs who were searching for him found his body buried beneath a pile of rocks in a canyon on the desert. He had been shot five times through the back of the head and neck with a .38 calibre Smith and Wesson special revolver.

According to the assertedly coerced confessions defendant acted alone throughout the series of criminal events herein described. Defendant testified, however, as follows: About three days after his arrival in Barstow, defendant met one George Potter by chance in a tavern. Defendant had become acquainted with Potter in 1950 when both were prisoners in San Quentin. When they met in Barstow, Potter asked defendant whether he could obtain any guns and stated that guns could be sold in Las Vegas. Defendant and Potter arranged to meet at Manning's house on February 2, take Manning's guns to Las Vegas, sell them and divide the proceeds. On February 2 Potter came to the Manning house, participated in the theft of Manning's property, and accompanied defendant in Manning's truck and thereafter in Arnold's station wagon. After defendant and Potter entered the station wagon Potter took the .38 calibre revolver. When the station wagon stopped off the highway Potter ordered defendant to exchange shoes with him and ordered Arnold to walk up the canyon. After Potter and Arnold were out of sight defendant, who remained at the station wagon in possession of the two submachine guns (at least one of which was loaded) and the two .45 calibre revolvers, with boxes of .38 and .45 calibre cartridges, heard shots. Potter returned to the station wagon and said that he had shot Arnold in the leg and left him in the canyon so that he could not pursue them. Potter hid in the back of the station wagon and kept a gun in his hand while defendant drove to Nevada. There Potter vanished.

Defendant then drove from Nevada to Pennsylvania. Before he reached Pennsylvania defendant erased Arnold's name from the registration slip of the station wagon and typed in his own name.

On February 9, 1953, a Pennsylvania police sergeant who had the station wagon listed on his "hot sheet" observed defendant driving it and arrested him. Defendant was wearing Manning's deputy sheriff's jacket and badge; he also had in

his possession Manning's handcuffs and revolvers, one of his submachine guns, and the altered registration slip for the station wagon. Defendant was held in a Pennsylvania jail and questioned by federal and Pennsylvania authorities. According to the testimony of the Pennsylvania sergeant, shortly after defendant's arrest he was told that the owner of the station wagon had been found "murdered" on the desert. Defendant, however, testified that he did not learn of the killing until February 12, when California authorities told him of it.

On February 11, California authorities arrived in Pennsylvania, talked with defendant, and defendant told them that he had found the station wagon parked by the road and had taken it without having seen the owner. On February 12, defendant made a statement, similar to his subsequent testimony at the trial, in which he attributed the shooting of Arnold to Potter. The California officials then took defendant to San Bernardino.

On the morning of February 14, deputy sheriffs took defendant to the canyon where Arnold had been killed. At this time defendant stated that he did not wish to see Judge Manning. After visiting the scene of the homicide, defendant and two deputies drove to Barstow. There by chance they encountered Judge Manning, who was with a constable in the constable's car. At the suggestion of Manning and the constable the two cars were driven about a mile and a half outside Barstow and stopped at the side of the road. It was then that the asserted coercion, consisting of statements by Manning in the substance and under the circumstances hereinafter detailed, occurred. Prosecution witnesses testified that the interview of February 14 between defendant and Manning took place in the open country, rather than in the sheriff's office, because at the time the office was crowded and did not permit privacy.

After the two cars stopped beside the road, Manning came to the deputies' car and sat in the back seat beside defendant. Defendant was wearing handcuffs and leg irons. Manning repeatedly said that defendant had betrayed him and had shot Arnold and defendant repeatedly denied having shot him. Manning called defendant foul names and wept, and defendant also began to weep. The officers described Manning variously as "slightly" angry, "pleading," and "hurt." There is no evidence that Manning made any direct threat in the hearing of the officers; he did say to defendant, "I wish

you and I were alone on the desert. . . . I would pull your flesh from your bones with my bare hands." Defendant said to Manning and the deputies, "write out anything and I will sign it if it will make Art [Manning] feel better," and they replied that they wanted only the truth. After this interview had continued for about 20 minutes, with further accusations by Manning and denials by defendant, defendant stated that he wished to talk with Manning alone. The officers walked a short distance away so that they could not hear the conversation between defendant and Manning. Defendant then orally confessed to Manning that he, acting alone, had killed Arnold and taken his station wagon. Manning called the officers to their cars and the entire party drove to Manning's house, where defendant wrote and signed a confession which describes the homicide and concludes with the statements, "My reason for this is because of Art Manning," and "The above statement was freely made by me," followed by defendant's initials and the signatures of the officers and Manning.

The testimony of defendant as to the circumstances inducing his above mentioned confessions of February 14 is not consistent. It is in essential part as follows: In the officers' presence Manning said, " 'if I could get you over here—' and he pointed to some trees farther over—'I would tear the skin from your body piece by piece.' " and defendant believed this statement. But defendant then asked to speak to Manning alone because "Mr. Manning seemed to be becoming more hysterical all the time and I thought if I could talk to him maybe I could get him to believe me." After defendant and Manning were out of the officers' hearing Manning said, "I know you killed that old man and you are going to tell me the truth if I have to take you over here and beat it out of you." Defendant believed this statement, falsely confessed because of his resultant fear, and made the written confession "the way Judge Manning told me to write it."

Manning testified that he made no threats toward defendant. There is prosecution evidence that after defendant and the deputy sheriffs had left Manning at his home on February 14, defendant said, "I feel a lot better. I am glad I got it off my chest, that is the least I can do for Art Manning after what I have done to him. If it was just you guys I never would have told you this story. When I told Art that story and signed the confession I knew I was going to the gas chamber."

Defendant's conversations with the officers on the afternoon of February 14 continued as they drove from the Manning

ranch to Barstow and then from Barstow to San Bernardino; defendant said that he had done "a cold blooded thing" and repeated his confession. On February 16 in the San Bernardino jail a deputy showed defendant Manning's .38 calibre revolver and defendant said that he thought it was the gun with which he had shot Arnold; the deputy showed defendant pictures of Arnold and defendant said that that was the man he had shot.

Defendant testified variously, as to his confessions, that "I may have said anything because I was scared"; that he ceased being "scared" after he reached the county jail on the afternoon of February 14; that he had never ceased to fear Judge Manning; and that he did not cease to fear immediate danger until he entered the courtroom on June 1, 1953.

As to the vanished or nonexistent George Potter, a clerk from San Quentin testified that he had searched the prison records, particularly those from 1920 until the time of trial, and found no indication that there had been an inmate with that name or alias.

## Sufficiency of the Evidence

Defendant contends that the evidence, without the assertedly inadmissible confessions, is insufficient to support the verdict. He suggests that the jury should have given more credence than they did to the portion of his testimony which seeks to cast responsibility for the killing on Potter. The peculiar circumstances of the asserted Potter's chance appearance in Barstow at the time of defendant's arrival there, his disappearance in Nevada just after the killing, and the absence of his name from the records of San Quentin, where defendant claims to have met him, together with other facts tending to impeach defendant, fully justified the jury in rejecting the whole of defendant's testimony as to Potter.

If defendant's testimony as to Potter is rejected or partially discounted, it then appears from the remainder of defendant's own testimony and from undisputed evidence of physical facts that defendant had a motive to steal Arnold's vehicle; that by misrepresentation that he was a deputy sheriff he obtained a ride with Arnold; that defendant, armed with the .38 calibre revolver, forced Arnold to walk to a place concealed from the highway, shot him repeatedly in the back, and buried him, then took the station wagon to flee from the scene of the homicide. From these circumstances the conclusion that the killing of Arnold was murder of the first degree, committed in the perpetration of robbery, is almost inescapable.

*Admissibility of Evidence of Defendant's Confessions*

Defendant urges that his confessions were obtained by methods so at variance with state and federal standards of fundamental, constitutional fairness that their use in evidence requires a reversal. There is no claim that the conduct of anyone other than Judge Manning was coercive; defendant does not suggest that any officer who was connected with the investigation or prosecution of the case at any time used force or any improper persuasion.

The trial court in its treatment of the confessions followed accepted California procedures (see *People* v. *Gonzales* (1944), 24 Cal.2d 870, 876-877 [151 P.2d 251]) which were materially similar to those used by the New York trial court in *Stein* v. *New York* (1953), 346 U.S. 156, 170-174 [73 S.Ct. 1077, 97 L.Ed. 1522]. In the Stein case the United States Supreme Court specifically considered the propriety of such procedures and upheld a death sentence.

The procedures in the lower court here were as follows: First the trial judge in the presence of the jury heard conflicting evidence as to the voluntariness of the confessions and made a preliminary determination that they were freely made and therefore admissible in evidence. The judge's statement of his entirely proper reasons for this determination is quoted in the margin.[1] After the trial judge made his initial factual determination that the confessions were admissible, their voluntariness was again passed upon by a trier of fact, this time the jury, which like the judge had the opportunity to observe the witnesses. The judge left to the jury, under proper instructions, the questions whether confessions were made, whether they were freely given, and whether they were true; he further instructed the jury that they could not consider a confession unless they found that it was voluntary.[2] On defendant's motion for new trial the judge again

[1]Prior to admitting the confessions in evidence the trial judge, outside the presence of the jury, said as to the asserted coercion of defendant, "The remarks that were made by Judge Manning reflected, in my mind, merely his distress of mind and hate, which is contempt, for the defendant and obviously were not made for the purpose of inducing the defendant to confess. On the contrary, they were such as would deter any person from making a confession or an admission at all, they would arouse resentment in most people's mind and the only evidence of any alleged threat . . . came from the defendant. I don't credit his testimony in the slightest degree."

[2]The jury were told, "If the jury concludes that a confession was not made voluntarily, it is the duty of the jury to entirely disregard the same and not consider it for any purpose."

considered and rejected defendant's arguments that the confessions were coerced and that their use violated due process.

It is true that this reviewing court cannot ascertain, either from the general verdict alone or from the record as a whole, how the jury answered the factual question whether the confessions were voluntary. Either the jury may have decided that the confessions were voluntary and true and relied on them to convict defendant, or (a more difficult mental feat) they may have decided that the confessions were involuntary, then disregarded them and based their verdict solely on the other, legally sufficient (and in itself overwhelmingly convincing) evidence of guilt. The requirements of due process do not contemplate ascertainment of the precise mental processes of the jury as to the confessions. (*Stein* v. *New York* (1953), *supra*, 346 U.S. 156, 177-179.)

But due process does require that this reviewing court go behind the verdict to the extent of making our own determination as to whether the confessions were coerced. In making this determination we do not weigh the evidence as a trier of fact. Rather, we accept as true that portion of the evidence of coercion which is uncontradicted. (*People* v. *Millum* (1954), *ante*, pp. 524, 527 [267 P.2d 1039], and United States Supreme Court decisions there cited.) As appears from the statement of facts (*ante*, pp. 863-865) there is some evidence tending to show psychological coercion, but there is practically no such evidence which is not contradicted. Manning's testimony that he made no threats to defendant must be understood as contradicting the implication of threats derived from the testimony that he used abusive language. Defendant's testimony that he was in fear of Manning and confessed because of such fear is contradicted by defendant himself; for example, after defendant had assertedly believed and been frightened by Manning's extravagant statement that if Manning were alone with defendant he "would tear the skin from [defendant's] . . . body," defendant nevertheless asked to be alone with Manning; according to other testimony of defendant he confessed to "make Art feel better" and to relieve defendant's own feeling of guilt. The record considered in its entirety overwhelmingly tends to show that defendant's confessions were true and were made because defendant felt that "that is the least I can do for Art Manning after what I have done to him."

It is urged on behalf of defendant that because Manning's statements can be construed to be of a threatening rather

than a pleading nature and were made either in the immediate presence of the officers who had defendant in custody or while they were within call, we are bound to hold that as a matter of law the confession which followed was coerced. ▮ We recognize that a confession is involuntary, even though it is induced by statements made by one without actual authority or control over the defendant, if such inducing statements are made to defendant in the presence of those who have such authority and under circumstances from which the accused can infer that the statements have official sanction. (*People* v. *Rogers* (1943), 22 Cal.2d 787, 805 [141 P.2d 722]; *People* v. *Silvers* (1907), 6 Cal.App. 69, 72-74 [92 P. 506]; *People* v. *Piner* (1909), 11 Cal.App. 542, 553 [105 P. 780].)

▮ But the mere fact that someone has made statements which might improperly induce a confession will not necessarily vitiate a subsequent confession if it is shown satisfactorily that in truth the statements did not induce or contribute to inducing the confession. Accordingly the cited cases have no application here, where it appears from any reasonable construction of defendant's own conduct and acts at the time of his initial confessions, as established by his testimony at the trial, that he was not acting in fear of Manning or the custodial officers.

### *Instructions Which Concern the Jury's Choice of Penalty*

▮ The jury were instructed that ''It is the duty of the jury to decide whether the defendant be guilty or not guilty of the offense charged considering all the evidence submitted to you in the case. It is not for you to consider the penalty prescribed for the punishment of the offense at all. If you are aware of the penalty prescribed by law it is your duty to disregard that knowledge. In other words, your sole duty is to decide whether the defendant is guilty or not guilty of the offense with which he is charged. The question of punishment is left wholly to the Court except as the law circumscribes its power.''

Thereafter the jury were instructed that ''The law of this state provides that every person guilty of murder in the first degree shall suffer death or confinement in the state prison for life, at the discretion of the jury that finds him guilty. If you should find the defendant guilty of murder in the first degree, it will be your duty to determine which of the two penalties shall be inflicted, the death penalty or confinement

in the state prison for life . . . In determining which punishment shall be inflicted, you are entirely free to act according to your own judgment."

The quoted instructions considered independently and out of context appear to be irreconcilably inconsistent, and the first quoted instruction, so considered, would be fatally inconsistent with section 190 of the Penal Code, which provides in material part that "Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the jury trying the same." It is also noted that in a death penalty case it has been held that the giving of the instruction that the jury were not to consider the penalty was "grave and manifest error" which required reversal. (*People* v. *Sainz* (1912), 162 Cal. 242, 247 [121 P. 922].) In the Sainz case, however, this court pointed out that the error of the isolated instruction that the jury should not consider the penalty was nowhere averted or cured by other instructions, and particularly noted that "Nowhere was the jury told what alternative punishments for murder in the first degree the law has prescribed, nowhere were they told that the decision as to which of the two punishments should be inflicted was a high duty imposed by law upon them."

Here the court properly told the jury, "you are to consider all the instructions as a whole, and are to regard each in the light of all the others." If the charge is so considered it appears that the portion of the instructions quoted *ante,* p. 868, which directs the jury not to consider the penalty should be construed as applicable only to that stage of their deliberations where they were concerned with the basic issue of the guilt or innocence of the defendant. It was only after the jury had resolved the issue as to guilt, with the many questions necessarily involved in the determination of that issue, that the provisions of the law of this state as to the penalty for murder of the first degree became relevant. Viewing the instructions as a whole, the jury must have understood that at this latter stage of their deliberations, if they reached such stage, they were to be guided by the instructions that "If you should find the defendant guilty of murder in the first degree, it will be your duty to determine which of the two penalties shall be inflicted, the death penalty or confinement in the state prison for life. . . . In determining which punishment shall be inflicted, you are entirely free to act according to your own judgment."

### Other Contentions of Defendant

Defendant states generally that throughout the trial the judge harassed defense counsel and expressed disbelief of the defense. A reading of the transcript discloses no such conduct on the part of the trial judge. ▮ Defendant particularly urges that the trial judge in effect deprived defendant of his right to cross-examine the witness Manning. The trial judge did, after insistent and repeated questioning of the witness by defendant's counsel as to his state of mind toward defendant, curtail this line of questioning, but he did so in the exercise of his power to control interrogation. (Code Civ. Proc., § 2044.)

▮ Even after the trial judge indicated that this line of interrogation should cease, defense counsel continued to question the witness on the subject. The trial judge then said, "Let us not take all day on that subject, you have already asked him that seven hundred times if he [the witness Manning] were mad [at defendant] . . . and I do not want that to reflect upon the integrity of this witness, that is the jury's job to determine that." While the statement that the question had been asked "seven hundred times" was a gross exaggeration, it was provoked by the undue persistence of defense counsel and by reason of the very obviousness of its character could not, in the light of all the circumstances, have been prejudicial. The further statement that "I do not want that to reflect upon the integrity of this witness" should not have been made but it does not appear to be, as defendant asserts, an indication that the judge himself was vouching for the integrity of the witness; he added, "that is the jury's job to determine that."

▮ Defendant complains that the trial judge refused to permit cross-examination of a deputy sheriff as to certain conversations with defendant. The matters complained of occurred on recross-examination. The trial judge pointed out that defense counsel had already had and exercised the opportunity to cross-examine the witness as to his original testimony on direct examination, and ruled that counsel could examine him as to new matter which had been brought out on redirect examination. It appears that the judge was not improperly limiting the scope of examination but rather was properly controlling its order and manner.

▮ Defendant asserts that the judge erred to his prejudice by curtailing his argument to the jury that the written confession should not be considered because it was involun-

tary. After defendant's counsel had argued that Manning's conduct preceding the confession was coercive, counsel said "if you believe that those threats were made and that they were threats, . . . then you may not consider for any purpose this purported confession. That is the law." The court said, "I am going to instruct the jury as to what the law is and I will ask you to refrain from telling the jury what your idea of the law is." This ruling was correct. Defense counsel neglected to state the applicable law completely. And it was for the judge to decide and instruct the jury as to questions of law; he could refuse counsel permission to argue the law, although counsel had a right to argue facts pertinent to the law. (*People* v. *Chessman* (1951), 38 Cal.2d 166, 188 [238 P.2d 1001].)

 The prosecuting attorney in questioning defendant as to prior convictions of felony for the purpose of impeachment asked whether he had been convicted of two violations of the Articles of War. Defendant admitted such convictions. Defendant's counsel asked the prosecuting attorney whether he was prepared to show that the two offenses were felonies. After discussion of the matter outside the presence of the jury, the prosecuting attorney moved to strike any reference to violations of the Articles of War. The motion was granted and the jury were instructed to disregard defendant's testimony as to the two convictions.

Defendant now asserts that the asking of the questions as to the convictions prejudiced him in the eyes of the jury. He makes no effort to show that the offenses were not felonies. Rather, he argues that the prosecuting attorney's motion to strike reference to such convictions showed that he had acted in bad faith when he originally asked about them. No bad faith and no prejudice appear. The prosecuting attorney had available in the trial court a certified record of the convictions and citations to federal cases and statutes as to whether the offenses were felonies. But it appears that he decided not to risk an adverse ruling on the possibly close question whether the convictions could be used for the purpose of impeachment, and therefore at his request reference to the matter was stricken from the record.

For the reasons above stated, the judgment and the order denying the motion for new trial are affirmed.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.