[Crim. No. 5460. Second Dist., Div. Three. May 21, 1956.]

THE PEOPLE, Respondent, v. BEN ROBERT REINSCHREIBER, Appellant.

Morris Lavine for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and John S. McInerny, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—In a trial by jury, defendant was convicted on four counts of grand theft. He admitted an allegation of the information that he had been convicted of a felony (issuing checks without sufficient funds). He appeals from the judgment and the order denying his motion for a new trial.

Appellant contends that the evidence was insufficient to support the verdicts; and that the court erred in instructing the jury, and in limiting his attorney's argument to the jury.

Some of the facts, with reference to Count I, are: On November 2, 1954, about 10 a. m., one Steiner introduced Mr. Scoll to defendant. At that time Steiner, whom Scoll had known about three years, said that defendant was a Cadillac

dealer and had five to eight Cadillac cars "coming in from out of state," and that he (Steiner) was going to take (buy) one of them. Defendant said that the cars were being transported into the state and he had to have $5,000 that had to be paid that day, before noon, in order to get the cars. Defendant also said that he had a dealership or "brokerage" in Cadillacs, and if Scoll would put up the $5,000 to pay the freight on the cars, that Steiner and Scoll would share "in 50 per cent" in the profit derived from the sale of the cars. Scoll relied on defendant's statement with reference to profits. Immediately after said conversation, Scoll borrowed $5,000 from a friend and gave the $5,000 in cash to defendant. Scoll testified that he did not consider the $5,000 was a loan to defendant; that Scoll was to be a partner in the venture with Steiner, defendant. and one Chodak (who will be referred to later). Scoll asked defendant "for the papers" on the vehicles that were being shipped. Defendant replied that they were coming with the vehicles. Scoll told defendant that he (Scoll) had to return the $5,000 to the lender within 10 days, that is, by November 12. Defendant said that he was sure the money would be covered by that time through the sale of the cars. On November 3, defendant told Scoll that the cars had not arrived but they certainly would be there that day, and that "there were to be more vehicles" making a total of 13, and he needed an additional $3,000 "to pick up the remaining five vehicles." Scoll then gave defendant three checks for $1,000 each to pay freight on the additional vehicles that were coming in. On November 4, Scoll saw defendant at Steiner's apartment, and he asked defendant if the cars had arrived. Defendant replied that they had not arrived, and that he had sent Chodak to Detroit to find out what was holding up the cars. Later that day Scoll returned to the apartment, accompanied by Mr. Otash, a police officer. (It was not disclosed to defendant that Otash was a police officer.) At that time defendant said that Scoll had given him $5,000 in cash and three $1,000 checks for the purpose of defraying the cost of transporting eight Cadillac automobiles to California from Detroit; that when the cars were sold, Scoll and Steiner were to derive half of the profit, and defendant and his partner (Chodak) were to derive the other half of the profit; that Steiner was to buy one of the cars; and that defendant had already put up $18,000 of his own money to buy the cars. Otash asked defendant if Scoll had lent the money to him. Defendant replied that he had

not and that they had entered into a business transaction and were partners. Defendant also said that his partner, Chodak, was in Detroit "that day" arranging to bring the cars back or that he was on the way back with them. Otash said that he thought defendant was a swindler and that the deal was a bunco scheme. Then Otash advised Scoll to stop payment on the three $1,000 checks, and to take the matter up with the police and district attorney. Defendant then said that he would prove that it was not a phony deal, that he would call Detroit "right now," and they could listen to his conversation. Thereupon defendant pretended to call Detroit and to have a conversation with someone in Detroit as to whether his man had arrived with the money and whether he had left with the cars. When he had finished the pretended conversation, he said that as far as he knew the cars were enroute to California. Otash noticed that defendant, while dialing the telephone, put "his thumb down on one of the buttons" of the telephone—the buttons upon which the telephone receiver rests when the telephone is not in use. Otash told defendant that he thought it was a phony and that he had observed the way defendant handled the telephone on the call to Detroit. Then defendant said that Otash had no right to accuse him of being a swindler. Scoll stopped payment on the three $1,000 checks.

Sometime between November 2 and November 12, 1954, defendant gave Scoll a promissory note for $5,000; and also during that time defendant gave Scoll a promissory note for $3,000. Two or three days after said amounts had been paid by Scoll to defendant, Scoll said that he had no proof that any money had been given to defendant; and he asked defendant to give him something to show that money had been given to him. Then defendant gave the notes to Scoll—both notes were given at the same time. About November 8, 1954, defendant paid $2,000 to Scoll. Prior to the trial in April, 1955, defendant paid the remaining $3,000—between said November 8, and January 1, 1955, $500 was repaid, and in March $2,500 was repaid. About November 12, 1954, defendant gave Scoll a check for $5,000, drawn by defendant, and payable to Scoll. The check was deposited in a bank by Scoll on January 17, and it was returned unpaid—"No such account."

In a conversation with a police officer after the arrest, defendant said that he never had any cars in prospect from

the east, and that he had not made any telephone calls to Detroit or any place east.

Counts II and III relate to transactions with Mr. Ross. Some of the facts, with reference thereto, are: About March 1, 1954, defendant told Ross that he purchased a car in Texas which he thought Ross would like to have, that it was a blue 1953 Fleetwood Cadillac with power steering and air conditioning, that it was in immaculate condition and had 6,000 miles on it, and that the price was $3,200. It was to be a Fleetwood 60 series. On that day, or a day or two thereafter, Ross gave defendant $1,750 cash to apply on the price. The car was to be brought from Texas and delivered within four or five days. A car was not delivered within that time and defendant said that the car was on the way from Texas, was delayed, had gotten into a sandstorm, and was being repaired. Ross had conversations with defendant for many days thereafter as to where the car was. About August 16, 1954 (about five months later), defendant told Ross that the car was ready for delivery, that it was being driven from Las Vegas and that Ross would have it that evening or the next day. Then Ross gave him a check for $1,450, which check was paid by the bank. A few days thereafter defendant said that he needed $158 additional for license and tax. Then Ross paid that amount to him. About September 15, defendant brought a Cadillac Fleetwood limousine to Ross, who said he did not want a car like that. He did not accept it. Defendant said that if Ross did not want the car, he (defendant) would sell it at a profit. Ross asked for the return of his money. Defendant said that he would return the money the next day, with the profit. Then defendant left, taking the car with him. He did not return the money the next day. About October 20, defendant gave Ross a check for $3,500, drawn by one Weingart, payable to and endorsed by defendant. Ross deposited the check in a bank, but it was not paid. On November 4, defendant gave Ross two $1,000 checks which were drawn by Scoll. Ross presented the checks to the bank but they were not honored by the bank. (These checks were involved in Count I, and Scoll had stopped payment of them as above stated.) Ross made further demands for the return of his money but he has received only $600.

Mr. Barton was present when defendant brought the limousine to Ross, and he heard Ross tell defendant that Ross could not use a limousine 75, that he wanted the 60 series. A few

weeks later, defendant told Barton that defendant had taken Ross' money to buy a Rolls-Royce for a customer and he made a quick $500.

Some of the facts, with reference to Count IV, are: On October 7, 1954, defendant told Mr. Lank that Chodak (who was then present) was a "car repossessor" for a finance company; that defendant had a 1952 Cadillac Coupe de Ville which Chodak had just repossessed; that the amount owed on the car was $1,612; that if Lank could pay that amount defendant would turn the car over to him. About an hour and a half later Lank told defendant that he would like to see the car before he paid the money. Defendant said that the car could not be seen until the money was paid. Lank paid $1,612 in cash to defendant and asked for a receipt. Defendant wrote and signed a document as follows: "Received of Harold Lank, $1,612. Said money to be used to purchase 1952 Cadillac Coupe de Ville, car to be approved by Harold Lank—If not I guarantee to sell said car and divide profit with Harold Lank." The next day defendant delivered a 1953 Cadillac. Lank asked what happened to the 1952 Cadillac. Defendant said that he could sell it to another buyer and make $400 profit for himself, and that Lank was to get the 1953 Cadillac at no further investment. Lank said that he would take the 1953 car at that time. Defendant said he could not leave the car there; that Chodak had to take it back to the finance company and keep it there for five days until "impounds" were cleared; that at the end of five days he would bring it back and turn it over to Lank for the $1,612. Five days later defendant asked Lank, by telephone, to meet him at a certain place, and stated that Chodak would meet them there with the car, and at that time the car would be turned over to Lank. Defendant and Lank went there about 2 p. m. and waited more than an hour for Chodak but he did not arrive. Later that day, defendant told Lank that Chodak had gone to San Bernardino to repossess a car, that he had been beaten up and was in a hospital there. A few days later, defendant told Lank that the 1953 Cadillac, which was to be sold to Lank, "was paid off by the original owner," and it had to be returned to the owner. Defendant also said that if Lank would wait, they would get a Cadillac for him. Thereafter defendant promised to deliver a car to Lank on November 6, but on that day defendant told him that the car, which was to be delivered to him, had been repossessed from a person who was in jail and that defendant's lawyer

was trying to get the car released. Defendant also said that the car would be delivered later that day. About a week later defendant told Lank that the transmission in the car was broken, and that Lank could accept it as it was or they could try to get the insurance company to pay for the damaged transmission. The next day defendant said that the insurance company would pay $460 to have the car fixed and the car was to be fixed at a certain garage. The next day Lank told defendant that the car was not at that garage. Defendant replied that he had decided not to take the car there, that instead of fixing the car he was going to take the check from the insurance company and then sell the car, and with the check and "the difference" he would get a 1954 Cadillac for Lank. Defendant told Lank to go to a certain dealer and select a 1954 Cadillac, and he would have the car delivered to Lank for an additional $400 or $500. On December 11 Lank selected a car and told defendant that he had selected it. Defendant replied that he would get it for Lank immediately, and that probably he would need $400 more but he could get that later. That car was not delivered. The next day Lank told defendant that he was tired of the "stalls" and that he wanted a car or the return of his money. Defendant said that he had found a better deal "for the same car for less money" from another person, and that he would get the car for Lank on that day. Then defendant made a telephone call to one Miller, who told Lank by telephone that defendant had given him a 1953 Cadillac, a check for $400, and that for $400 more he would deliver a 1954 Cadillac to Lank. Lank replied that that was "Fine," and asked where he could meet Miller and get the car. They made an appointment to meet at 2 p. m. that day. Lank was present at the appointed place and time, but Miller did not appear and the car was never delivered. That afternoon defendant told Lank that he would deliver the car that evening. The car was not delivered. Lank relied upon the statements of defendant regarding the automobile. Lank did not receive any automobile from defendant; and no part of the money that Lank paid to defendant was returned to Lank.

Lank filed a civil action to recover the money he paid to defendant. (The action was filed on April 21, 1955, during the trial of the present case.)

In a conversation with police officers, defendant was asked why he did "these sort of things," and he replied that since

his indictment in Las Vegas he "was robbing Peter to pay Paul."

Defendant did not testify, and he did not call any witness in his behalf.

Appellant argues, with respect to his claim of insufficiency of the evidence, that the transactions with Scoll, Ross and Lank were civil transactions and did not constitute theft. As to the Scoll transaction, he argues further that the negotiations were varied from time to time and there was to be a division of profits, and when the transaction was not completed satisfactorily he received all his money back and there was no theft. As to the Ross transaction, he argues that the only kind of car specified was a Cadillac Fleetwood and that he delivered a Cadillac Fleetwood limousine, and when Ross would not accept the limousine the matter became a civil case of a dissatisfied buyer and there was no theft. As to the Lank transaction, he argues that the 1952 Cadillac was to be approved by Lank and if he did not approve it the car was to be sold and profit divided with Lank; that when defendant discussed selling the car (to another customer) for a profit, Lank said that was satisfactory with him; that after several conversations with defendant regarding a car, Lank finally said he wanted his money; and he filed a civil action to recover it. He argues further that there was no corroboration of any of his alleged representations, as is required by section 1110 of the Penal Code in a prosecution based on alleged false pretenses.

■ Theft, as defined in section 484 of the Penal Code, includes theft by trick and device, theft by false pretenses, and embezzlement. (*People* v. *Jones,* 36 Cal.2d 373, 376-377 [224 P.2d 353]; *People* v. *Ashley,* 42 Cal.2d 246, 258 [267 P.2d 271]; *People* v. *Bartges,* 126 Cal.App.2d 763, 769 [273 P.2d 49].) ■ "Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an 'unlawful taking' has been proved." (*People* v. *Ashley, supra,* 258.) ■ On appeal from a judgment of conviction of theft, where the only asserted basis of appeal is insufficiency of the evidence, the judgment must be affirmed if there is sufficient evidence to support the judgment on the theory of theft by trick and device, or by false pretenses, or by embezzlement. (See *People* v. *Jones, supra,* 375; *People* v. *Andary,* 120 Cal.App.2d 675, 680 [261 P.2d 791].) ■ "Larceny by trick and device is the appropriation of property, the

possession of which was fraudulently acquired; obtaining property by false pretenses is the fraudulent or deceitful acquisition of both title and possession.'' (*People* v. *Ashley, supra,* 258.) In *People* v. *Bartges, supra,* 126 Cal.App.2d 763 [273 P.2d 49], wherein the crime was theft by trick and device, the court said at page 770: The evidence ''clearly shows that appellant, with a preconceived design to appropriate the money to his own use, obtained possession of it by means of fraud and trickery. The fraud vitiated the transaction and the owner is deemed still to retain a constructive possession of the property. The owner does not part with title to the alleged thief where, as here, he delivered it to appellant to be applied by the latter to a particular purpose and the recipient, having obtained possession with the preconceived intention to appropriate the money to his own use, subsequently did convert it to his own use instead of applying it to the purpose contemplated by the owner.'' In *People* v. *McCabe,* 60 Cal.App.2d 492 [141 P.2d 54], it was said at page 496: ''Such crime [theft by trick and device] usually results when the victim of a fraud intends not to pass complete title to his property but that it shall be applied to a special purpose while the recipient of the property intends to appropriate it to his own use.'' ██ Corroboration is required to prove theft by false pretenses (Pen. Code, § 1110; *People* v. *Ashley, supra,* 259) ; but corroboration is not required to prove theft by trick and device. (*People* v. *Bartges, supra,* 771.)

██ In each of the three counts in the present case, the evidence would support a finding that the money was taken by defendant from the prospective purchaser for the specific purpose of paying for freight on automobiles or paying for an automobile, and at the time of so taking the money defendant had the preconceived design and intention of appropriating the money to his own use. As to the first count, the evidence shows that defendant did not have any automobile coming from the east and that there was no freight bill to pay with the money he took from Scoll, and that defendant appropriated the money to his own use in buying a Rolls-Royce to make a quick $500. ██ The fact that defendant returned Scoll's money (more than a year after he took it) is not a defense to the criminal charge. (See *People* v. *Wynn,* 44 Cal.App.2d 723, 729 [112 P.2d 979].) ██ As to the second count, the evidence shows that defendant had not purchased an automobile in Texas, he did not have an automobile for delivery to Ross such

as the one described by defendant, and he appropriated the money to his own use (repaying, after many months, only $600 of the $3,358). As to the third count, there was ample evidence to support a finding that defendant did not have a 1953 or 1954 automobile or any automobile for delivery to Lank, and he appropriated the money to his own use by keeping all of it. As to all counts, defendant made many untrue statements as to highly material matters.

As above indicated, it was not necessary (in order to prove theft by trick and device) that the testimony of the victims of the fraud be corroborated. (See *People* v. *Bartges, supra,* 126 Cal.App.2d 763, 771 [273 P.2d 49].) It appears, however, that there was corroboration of such testimony. The testimony of Officer Otash (who accompanied Scoll when he talked to defendant) corroborated Scoll's testimony. The testimony of Barton (who was present when defendant brought the limousine to Ross) corroborated Ross' testimony that the automobile was to be a 60 series—not a limousine 75. The receipt given to Lank by defendant corroborated Lank's testimony that the money he gave defendant was to be used to purchase a 1952 Cadillac. ▮ The testimony of each victim in each count was corroboration of the testimony of each victim in the other counts, since the trickery involved in all the transactions was similar. (See *People* v. *Ashley, supra,* 42 Cal.App.2d 246, 268 [267 P.2d 271] ; and *People* v. *Frankfort,* 114 Cal.App.2d 680, 701 [251 P.2d 401].)

▮ The asserted defense that Scoll and Lank were defendant's partners has no merit. The same trickery which was the basis for getting the money from Scoll and Lank was the basis for the alleged creating of a partnership. It is evident that defendant was using some of the money which he stole from one person to repay money he stole from another person.

▮ In the present case, the evidence amply supports the convictions of grand theft by trick and device.

▮ A further contention of appellant is that the court erred in failing to instruct the jury on corroboration as required in a prosecution based on false pretenses; and on the elements of the crime of false pretenses. Instructions were given which properly defined theft and forms of theft, namely, larceny by trick and device, obtaining property by false pretenses, and embezzlement. Also there was an instruction that if the jury found that defendant committed any of the three kinds of theft, it should return a verdict of guilty, and

it would not be necessary to state in the verdict which of the three forms of theft was committed. In *People* v. *Waxman*, 114 Cal.App.2d 399 [250 P.2d 339], the court said at page 409: "[T]he jury were required only to determine as to each count whether the crime of grand theft had been committed. [Citations.] Courts and lawyers are no longer required to puzzle over fine distinctions between the crimes formerly denounced by separate statutes. The crime is complete when the criminal agency appropriates the property of another to his own use without regard to the particular route he chooses to effectuate his wicked purpose. . . . The jurors might not agree on the ancient technical distinctions of the three crimes, but at the same time agree that the defendant stole the money." It is to be noted that defendant did not request the giving of such instructions as he now asserts should have been given. Irrespective of whether there was such a request, the court did not err in not giving such instructions which pertain to theft by false pretenses. As above stated, the evidence was sufficient to support the judgments of conviction upon the theory that grand theft by trick and device had been committed. Also as above stated, corroboration was not required to prove theft by trick and device.

 Appellant also contends that the court erred in failing to instruct the jury on the defense of claim of title in an embezzlement charge. Appellant did not request such an instruction. Apparently such an alleged claim of title refers to an implication, assertedly developed in cross-examination of the People's witnesses, to the effect that the money became partnership money. "It is the duty of a court in criminal cases to give, of its own motion, instructions on the general principles of law pertinent to such cases . . .. But it is not its duty to give instructions upon specific points developed through the evidence introduced at the trial, unless such instructions are requested by the party desiring them." (*People* v. *Bender*, 27 Cal.2d 164, 175 [163 P.2d 8].)

 Furthermore, the failure to give such an instruction pertaining to embezzlement was not prejudicial since the evidence was sufficient to support the judgments upon the theory of theft by trick and device.

 Appellant also asserts that the court erred in failing to give an instruction that it was necessary for the prosecution to prove a specific intent to steal. He did not request such an instruction. In the instruction defining the three forms

of theft, the jury was properly instructed with reference to knowledge, design and intent of a person in obtaining, converting, and depriving the owner of the title to or possession of property. The jury was adequately instructed on the subject of intent to commit theft.

Appellant also contends that the jury should have been instructed as to the elements of a partnership. At his request the jury was instructed that a general partner cannot be convicted of embezzling partnership property which comes into his possession during the course of the partnership business. ██ The court refused to give a part of the requested instruction which part was to the effect that if Scoll invested money with defendant to purchase or transport automobiles, and that upon a sale of the automobiles Scoll and defendant were to divide the profits, then Scoll and defendant were general partners. As above stated, the same trickery which was the basis for the theft by trick and device was the basis for the alleged creating of a partnership. It would have been error to instruct the jury, as requested, to the effect that merely investing the money for such purposes would create a partnership. If the payment of the money to defendant was procured by trickery and fraud a partnership would not be created. The court did not err in refusing to give said part of the requested instruction. Defendant did not request an instruction stating the elements of the partnership, and the court did not err in failing to give such an instruction.

██ Appellant contends further that the court erred in giving an instruction on the subject of accusatory statement. He argues that the alleged accusatory statement was promptly denied and there was no conduct warranting such an instruction. It is true that when Otash told defendant that he thought defendant was a swindler and that the whole deal was a bunco scheme, the defendant replied that he would prove to them that it was not a phony deal and he would call Detroit and they could listen to the conversation. It is to be noted, however, that when Otash (after defendant's pretended telephone conversation) "called him on the way he handled the phone" and told him that he thought it was a phony, the defendant did not deny the accusation that it was a pretended telephone call, and his only reply was that Otash had no right to accuse him of being a swindler. The court did not err in giving the instruction.

Appellant also asserts that the court erred in limiting the argument of his attorney when he was addressing the jury. Appellant has not set forth in his brief the statements his attorney made immediately preceding the alleged limiting of argument. The attorney for defendant, in his argument, said that the law of this state is simple as to what a partnership is, "one partner in the course of a partnership cannot embezzle——." The deputy district attorney objected on the ground that defendant's attorney was arguing the law to the jury. The judge said that the attorney might argue any point of law that is applicable to the facts of the case. The attorney then continued his argument by stating that if there was a partnership between Scoll and defendant "then the law of California states, and I am reading now from People vs. Brody——." The deputy district attorney objected to the reading from any case. The court said that the attorney might argue the law, but he was not going to permit the attorney to read the decisions; that the attorney might argue the facts, but he should not argue as to what he thinks the law is; that the attorney might argue the facts and say that from those facts, if the court so instructs the jury, the jury might bring in a verdict accordingly, if the court gives the instruction; and that the court would tell the jury what the law is. In *People* v. *Baldwin,* 42 Cal.2d 858 [270 P.2d 1028], defendant's attorney made a statement regarding a legal matter and then said (p. 871): "That is the law." The judge said: "I am going to instruct the jury as to what the law is and I will ask you to refrain from telling the jury what your idea of the law is." The Supreme Court said (p. 871) that the ruling was correct and that it was for the judge to instruct the jury as to questions of law, and "he could refuse counsel permission to argue the law, although counsel had a right to argue facts pertinent to the law." In the present case the court did not unduly restrict defendant's attorney in his argument to the jury.

Appellant also asserts that the court erred in giving an instruction to the effect that as to any evidence against defendant which he can reasonably be expected to deny, if he does not testify the jury may take that failure into consideration as tending to indicate the truth of such evidence. It was proper to give the instruction. (See *People* v. *Steccone,* 36 Cal.2d 234, 239 [223 P.2d 17].)

The judgment, and the order denying the motion for a new trial, are affirmed.

SHINN, P. J.—I concur in the judgment and in the opinion except in a single particular. I think defendant's attorney was unduly restricted in the arguments. He was endeavoring to argue that defendant and one or more of the victims were partners and undertook to state what constitutes a partnership. He was abruptly halted and told the court would instruct as to the law.

The notion that counsel must refrain from ever mentioning any principle of law in argument is a fetish that is often carried to inordinate lengths. Almost all argument is devoted to the matter of the duties of the parties, what they had or had not a right to do, and in criminal cases to the elements of the offense. Instead of instructing the jury before the arguments the court instructs after they are finished. If counsel undertake to discuss the duties of the parties in, we'll say, a negligence case, and mention familiar provisions of the vehicle code, they are halted and told that the court will state the law. In a criminal case argument is necessarily directed toward the evidence that is relevant to the elements of the offense, and whether those elements have been established. But the jury may have to wait for the instructions to learn what are the elements of the offense. A forceful argument that there was no evidence of an intent to defraud may be regarded as quite irrelevant by a jury that is uninformed that a specific intent must be proved and to inform them of that fact when the argument is cold and largely forgotten cannot recapture its effectiveness. There is no sense in limiting argument to discussion of the evidence relevant to the rights and duties of the parties while the jury is kept in ignorance as to what those rights and duties are. The jury should be informed as to the essential factual issues under applicable principles of law and appropriate instructions should be given before the arguments. I am convinced, however, that there was no error in the trial that was prejudicial.

VALLÉE, J.—I concur in the judgment and in the opinion except in the particular noted by Mr. Presiding Justice Shinn. I agree with his comment.

Appellant's petition for a hearing by the Supreme Court was denied June 20, 1956. Carter, J., was of the opinion that the petition should be granted.