[Crim. No. 6258. Second Dist., Div. One. Dec. 9, 1958.]

THE PEOPLE, Respondent, v. JACK KRUPNICK,
Appellant.

Albert R. Linnick for Appellant.

Edmund G. Brown, Attorney General, and John M. Huntington, Deputy Attorney General, for Respondent.

LILLIE, J.—Defendant was convicted by the court sitting without a jury on one count of grand theft. After reducing the offense to petty theft, the court sentenced him to six months in the county jail. Defendant appeals from the judgment of conviction and order denying motion for new trial.

Appellant claims that as a matter of law the evidence is insufficient to sustain the conviction, and there is a material variance between the proof and the information which charged him with wilfully, unlawfuly and feloniously taking over $200 in money, the personal property of Barbara Wilson, on or about May 2, 1957.

The crime of theft under section 484, Penal Code, includes theft by embezzlement, obtaining money by false pretenses, or larceny by trick and device (*People* v. *Cannon,* 77 Cal.App.2d 678 [176 P.2d 409] ; *People* v. *Reinschreiber,* 141 Cal.App.2d 688 [297 P.2d 658] ; *People* v. *Ashley,* 42 Cal. 2d 246 [267 P.2d 271]), and "(O)n appeal from a judgment of conviction of theft, where the only asserted basis of appeal is insufficiency of the evidence, the judgment must be affirmed if there is sufficient evidence to support the judgment on the theory of theft by trick and device, or by false pretenses, or by embezzlement." (*People* v. *Reinschreiber,* 141 Cal.App. 2d 688, 696 [297 P.2d 658].)

■ To constitute an offense of obtaining money by false pretenses, these elements must be present: an intent to defraud, an actual fraud committed, the use of false pretenses to perpetrate the fraud and reliance upon the fraudulent representations in parting with the money or other property. (*People* v. *Frankfort*, 114 Cal.App.2d 680, 697 [251 P.2d 401].) ■ Generally this crime involves the fraudulent or deceitful acquisition of both title and possession of the property or money taken (*People* v. *Ashley*, 42 Cal.2d 246, 258 [267 P.2d 271]). ■ Of a similar nature is the crime of larceny by trick and device. It consists of the appropriation of money or property, the possession of which was fraudulently acquired (*People* v. *Ashley*, 42 Cal.2d 246, 258 [267 P.2d 271]), and usually results when the victim intends it shall be applied to a special purpose—as a loan to enable defendant to carry out some special plan, as an investment, or for the purchase of property; which money defendant intends to appropriate to his own use. (*People* v. *Reinschreiber*, 141 Cal.App.2d 688 [297 P.2d 658]; *People* v. *McCabe*, 60 Cal.App.2d 492 [141 P.2d 54].) In these instances, title does not pass to defendant upon delivery of possession of the property or money, and if he takes it with intent to appropriate it for his own use, it is larceny. (*People* v. *Beilfuss*, 59 Cal.App.2d 83 [138 P.2d 332]; *People* v. *Fawver*, 29 Cal.App.2d Supp. 775 [77 P.2d 325].)

■ Viewing the evidence in the light most favorable to respondent, there is in the record before us ample evidence to sustain the conviction of theft either on the theory of obtaining money by false pretenses or larceny by trick and device. On the issue of false pretenses, defendant told the complaining witness, Barbara Wilson, his name was Bob Calhoun, he was in the oil business, his company had just brought in an oil well, and he owned one in Texas; that he would invest her money in the oil business which would pay her a return of $1,400 on each $200 invested, and the $400 she invested would be used as part of the expenses of getting the oil out of the new well. Defendant created an appearance of wealth and substance by driving several new Cadillac automobiles and a new Thunderbird, by telling her he used code names so he would not be bothered by telephone calls and by representing he had inherited $11,000,000 and had run it up to $20,000,000 or $30,000,000. These statements and the appearance created were entirely false. A reasonable inference from this and other evidence was that Barbara relied

upon them when she gave him the money to invest, and that defendant intended to defraud her and did appropriate her money to his own use. The evidence further shows that she never received that for which she invested her money, defendant at no time has had the means with which to pay her, and knew he could not pay her, and an actual fraud occurred. On the other hand, the trick and device used by defendant was the purported investment for which he obtained and accepted Barbara's money. She gave him her $400 for the sole purpose of, and to be used for, an investment in his oil business, specifically as part of the expenses of getting the oil out of his new well.

Barbara Wilson first met defendant in December, 1956, when he called her and told her his name was Bob Calhoun. He also told her he intended to produce a movie, was in the oil business, owned an oil well in Texas and that his company had just brought in a new well. In addition, he said he had inherited $11,000,000, had increased it to $20,000,000 or $30,000,000, and had given away to friends much money, as high as five or ten thousand dollars at a time, Cadillacs, diamonds and minks. During the time in question, Barbara saw him drive two or three different new Cadillacs and a new white Thunderbird.

Defendant told Barbara that if she would invest her money in his oil business he would make her "a great deal of money" and she testified he "offered me an oil investment; for each $200 I gave him I would get $1,400 back. And I gave him $400 for this investment on two different occasions." On February 20, 1957, pursuant to his request, she gave him $200 which he said would be used as part of the expense of getting oil out of his company's new well. He told her he was doing her a favor investing her money and promised her a return of $1,400 for her $200. He insisted on having the money in cash, which she gave him after writing a check for the amount. For a receipt she asked him to sign a promissory note she had secured at the bank when she cashed her check, which he refused saying he couldn't sign anything without his lawyer, but with her eyebrow pencil on a piece of paper he composed and wrote: "I owe Barbara Wilson $200" and signed it "B.C." She did not lend him the $200 but gave it to him solely as an investment to be specifically used in his oil business for which he guaranteed to her, and she expected, a return of $1,400.

On April 26, 1957, defendant told her if she invested $200

more she would get back another $1,400. He arranged to meet her outside her bank since he wanted the money in cash as he didn't want his business partners to know he was doing a good turn for her. She wrote another check for cash in the sum of $200. He told her the $2,800 proceeds of this and the other investment he would return to her in May or June.

Thereafter, she saw him personally several times and they talked to each other on the telephone. Several weeks later, she asked him about the $2,800. He told her that instead of the $2,800 he would give her a new Thunderbird. She agreed and he promised to get it to her in June. After many excuses from defendant she finally realized she would get neither the $2,800 nor the Thunderbird.

On the two occasions she gave him the $200, Barbara knew defendant only by the name of Bob Calhoun, but after meeting the real Bob Calhoun in early June, 1957, she called defendant and told him she knew he was not Bob Calhoun, that she wouldn't get the Thunderbird and that she wanted her money back. He then admitted to her he had lied all along and had no money to pay her.

In his own defense defendant testified he had used the names of Bob Calhoun, Jack Howard and Roland Jones; that he assumed the name of Bob Calhoun because he was a prominent oil man and popular with the women. He called Barbara giving his name as Bob Calhoun. On occasions he took her to the race track and although he knew nothing about the horses, led her to believe he did, taking $100 from her to bet on a horse in early February, 1957. He further testified that Barbara did give him money, $200 in late February, and $200 at the time to which Barbara testified, but that their relationship was a social one and she gave him the money as a loan, although he did tell her when he took it he would make a little extra money for her. After the first transaction, she asked for her $200 on numerous occasions prior to the second time in April when he took the other $200, but he told her he didn't have the money. He denied Barbara ever asked him for $1,400 or that he promised her a new Thunderbird, but admitted he would buy her something nice around Christmas. He continued to see her until the middle of June.

As part of his claim that the evidence is insufficient to support the judgment, appellant argues that there are inconsistencies in the testimony of Barbara Wilson regarding the

dates on which she gave him the money and was to receive the proceeds.

At the preliminary hearing, Barbara testified she gave defendant the first $200 around May 2, and another $200 near the end of May. At the trial she testified that at the preliminary hearing she was in error as to the dates and that the first payment was actualy made by her on February 20, 1957, and the second on April 26, 1957. To explain the conflict she said that when she went to the preliminary hearing, she did not know the exact time and was guessing; that she did not realize the dates were so important and had she known she could have ascertained them from her cancelled checks, which she did not have with her; but that since then she has found the checks and now knows the exact dates as February 20 and April 26, 1957. ■ As for any inconsistencies in the testimony "(I)t was, of course, for the trial court to resolve the conflicts and inconsistencies in the testimony, and determine the weight to which it is entitled." (*People* v. *Frankfort*, 114 Cal.App.2d 680, 692 [251 P.2d 401].) Not only does the record disclose an adequate explanation for Barbara's confusion as to the dates, but there appears to have been no prejudice to defendant because of it. He admitted in his own testimony that there were two occasions when Barbara gave him $200. He himself fixed the date of the first one in the latter part of February and remembered the second occasion about which she testified, which, according to her testimony, was April 26, 1957.

Along this same line, appellant argues that several defense witnesses testified Barbara knew defendant by his true name when she gave him the money. Defendant himself testified he told her his name was Bob Calhoun and did not tell her the name of Jack Krupnick; that besides Krupnick, he used the names of Calhoun, Howard and Jones; that he believes after January, 1957, Barbara knew him as Jack Krupnick and Bob Calhoun, and most of the time called him Jack Krupnick, although on some occasions called him "Bob." Penny Williamson and Gloria Renfrow, employees for the telephone exchange of which defendant was a customer, testified for the defense that he kept the names of Robert or Bob Calhoun on the exchange and also the names of Jack Krupnick, Jack Howard and Roland Jones; that early in 1957 they received calls from Barbara Wilson who sometimes asked for Calhoun or for Krupnick. Roland Jones, owner of a Cadillac rental agency which rented Cadillacs to defendant on more than 15

occasions, also testified for the defense that he met Barbara twice in December, 1956, and on both occasions he called defendant Mr. Krupnick in her presence.

On this point Barbara testified defendant introduced himself as Bob Calhoun; that she knew him only by that name on the two occasions she gave him the money; that he signed his "IOU" February 20, 1957, with the initials "B.C."; that he asked her to call him at the exchange by his code name, Roland Jones, although his name was still Bob Calhoun and that she does not know and has never seen Roland Jones. She further testified that she always called him through the exchange and asked for Bob Calhoun until he told her to ask for Roland Jones; that before June, 1957, she never called him Jack Krupnick. Robert Calhoun, vice president of East Puente Oil Company, vice president of Calhoun Realty & Oil Company and chairman of the board of Superior Mortgage Company, a witness for the prosecution, testified that after meeting Barbara at a party in June, 1957, he called defendant through a number given to him by the police department and told defendant he learned he was impersonating him and using his name and number, and requested him to immediately take them off the exchange. Defendant told him he was only using his name to impress several girls and he would stop using it, but asked if he could continue to use it for one girl. Mr. Calhoun said no and defendant agreed not to use it again.

Here again the factual conflict was resolved by the trial judge. There is ample evidence that Barbara did not know defendant by his true name until June, 1957, after she met the real Robert Calhoun. The lower court obviously rejected the testimony of defendant and his witnesses on this point.

Appellant's third claim that "nowhere was evidence given as to the year of the alleged takings" is unsupported by the record and entirely without merit. At the trial Barbara Wilson definitely fixed the dates on which she gave money to defendant for an oil investment. She testified repeatedly the first transaction occurred on February 20. She also established the year as follows:

"Q. (by deputy district attorney) Now, when you gave him this first two hundred dollars on February 20, 1957—was it? A. Yes."

She likewise testified that the second transaction occurred April 26. On two occasions the year 1957 was established.

"Q. (by deputy district attorney) And the two hundred

dollars that you gave him on April 26, 1957, was that by check or by cash? A. That was by cash."

And again:

"Q. (by deputy district attorney) After you gave him two hundred dollars on April 26, 1957, did you have any further conversation with the defendant pertaining to your investment? A. Yes, I did. He called me."

As to the date on which the $2,800 return was to be paid, she testified that he promised it in May or June; and later, that he promised her instead a Thunderbird which he would have for her in June. From the entire evidence, it is a reasonable inference the May or June referred to the year 1957. In June of 1956, she had not yet met defendant and in June, 1957, when pressed for the money or Thunderbird and confronted with his misrepresentations, he admitted he had lied to her.

■ Before this court will reverse a conviction upon the insufficiency of the evidence, from the record it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support the trial court's conclusion. (*People* v. *Newland*, 15 Cal.2d 678 [104 P.2d 778].) We find ample evidence to sustain the conviction of theft either on the basis of false pretenses or by trick and device.

In support of his second claim of error that there is a material variance between the proof and the allegations of the information, appellant argues that the charge that the theft was committed "on or about May 2, 1957" misled him in making his defense and that he is in danger of being placed in double jeopardy. The evidence discloses the takings occurred February 20, 1957, and April 26, 1957.

■ Appellant has failed to establish that he was misled or in what manner his rights were adversely affected. He asserts he came to trial prepared to show that Barbara Wilson knew his real name before May 26 and had demanded the return of her money before this date. The record is clear that defendant in his defense actually showed by his own testimony, and that of Roland Jones, Penny Williamson and Gloria Renfrow, that Barbara knew defendant's true name was Jack Krupnick as early as December, 1956, and in the early months of 1957. The trial court, however, rejected this testimony and accepted Barbara's version that she did not know defendant's true name until June, 1957. On his second point, defendant himself testified that Barbara demanded her money back between the first and second transactions. In his own testimony

he placed the first taking in latter February and remembered the second as she testified to it, as being on April 26.

We fail to see any prejudice to defendant; he offered no alibis for these dates and he freely admitted he had taken $200 from Barbara at those times. The only dispute was the intent with which the money was given—Barbara claiming she gave it to him for an investment; defendant claiming she gave it as a loan. Nor does the record show, although he objected at the time of trial to the variance, that he requested any continuance for the purpose of otherwise preparing his defense to meet the "other dates." (*People* v. *Cook*, 136 Cal. App.2d 442 [288 P.2d 602].)

 Of course, the purpose of an information is to notify the accused of the charge he is to meet at the trial. (Pen. Code, § 952; *People* v. *Massey*, 151 Cal.App.2d 623 [312 P.2d 365].)

 Ordinarily, the prosecution does not need to prove the date alleged therein with exactness if it shows the offense took place before the filing of the information and within the period of limitation. (*People* v. *Cunningham*, 99 Cal.App.2d 296 [221 P.2d 283]) unless time is a material element. (*People* v. *Murray*, 91 Cal.App.2d 253, 257 [204 P.2d 624]; *People* v. *Becker*, 140 Cal.App. 162 [35 P.2d 196]; *People* v. *Tracy*, 50 Cal.App.2d 460 [123 P.2d 138]; *People* v. *Roebling*, 14 Cal.App.2d 586 [58 P.2d 929].)

Time in itself is not a material element in this offense—no alibi was offered. The defense shows defendant knew in advance what accusations he must meet. He has failed to demonstrate that he was in any way misled in making his defense or that any substantial right on the merits was adversely affected.

Appellant argues he may be placed in double jeopardy by being again charged with the same offense. Although the statute of limitations has run on the petty thefts, he claims that since it cannot be determined which taking the trial judge had in mind in finding petty theft when he reduced the offense, another series of transactions including the ones proved herein might be made to charge another offense of grand theft.

In the case at bar, the evidence covered transactions between defendant and Barbara Wilson from December, 1956, when he first met her, until June, 1957, when they parted company. Under the information the trial court could have convicted defendant for any grand theft which occurred during this time, since the court heard evidence of the defendant's activities during the entire period. If defendant is ever

again charged with grand theft from Miss Wilson between December, 1956, and June, 1957, he will be entitled to the benefit of the plea of double jeopardy. (*People* v. *Bechtel*, 41 Cal.2d 441 [260 P.2d 31].) █ Whether jeopardy has attached is generally a question of fact and if defendant is ever again charged with grand theft for any of the acts in question which formed the basis of the present prosecution, he may show former jeopardy by the evidence produced in this case. █ Extrinsic evidence is admissible on the trial to identify the offense of which a defendant has already been convicted. (*People* v. *Braddock*, 41 Cal.2d 794, 800 [264 P.2d 521] ; *People* v. *Williams*, 27 Cal.2d 220, 226 [163 P.2d 692].)

Having failed to demonstrate that he was misled in making his defense or that he will be deprived of the benefit of a plea of former jeopardy in the event of another trial for the same offense, defendant has failed to show a fatal variance.

For the foregoing reasons, the judgment and order are and each of them is affirmed.

White, P. J., and Fourt, J., concurred.