[Crim. No. 8211. Second Dist., Div. Three. Mar. 20, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. GLENN PAISLEY, Defendant and Appellant.

Leon Mayer, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

FORD, J.—The defendant was accused of the murder of Alice Cooper. In a trial by jury he was found to be guilty of murder in the second degree. His motion for a new trial was denied and he was sentenced to be punished by imprisonment in the state prison. His appeal is from the judgment and from the order denying his motion for a new trial.

In addition to the contention that the evidence was insufficient to justify the conviction, the defendant asserts that there was error in the exclusion of evidence as to the reputation of a prosecution witness for truth, honesty and veracity and that the jury should have been instructed upon the subject of manslaughter.

The evidence will be summarized. Bill Bozarth testified that Alice Cooper managed his premises, consisting of light housekeeping rooms and apartments, on West Fourth Street in Los Angeles. In a telephone conversation which occurred about noontime on July 31, 1961, she told Mr. Bozarth that she had rented one of the rooms. Mrs. Cooper lived with her husband on the first floor of the building.

Harold Grant Smith, a waiter, testified that he had known the defendant, who was also a waiter, for approximately five and a half years. On July 31, 1961, before noon he saw the defendant in the union hall where jobs were assigned. Later in the day he went to the place where the defendant was living, which was a short distance from the union hall. The

defendant did not appear to have been drinking any alcoholic beverage. While Mr. Smith was in the room, the landlady came in. He said that an exhibit (which the first witness had identified as being a picture of Alice Cooper) was a picture of the landlady. The landlady asked if the defendant was sick and the witness replied that the defendant felt a little nauseated which, he presumed, was due to the heat. When Mr. Smith left between 3 and 3:15 p.m., the landlady remained in the room.

Joseph Bagley, a waiter, lived on the premises which were managed by Mrs. Cooper. Shortly after 3 p.m. on July 31, 1961, he went to his room. Mrs. Cooper immediately called him into the defendant's room to introduce Mr. Bagley to the new roomer. The witness recognized the defendant. The defendant said that he had just rented the room. Thereafter Mrs. Cooper left the room. Mr. Bagley went to his room and returned with a bottle of beer and each drank some beer. When he left the room, Mrs. Cooper was in the hallway. She asked Mr. Bagley if the defendant was all right and he said that he was, as far as he knew.

Shelly Thome, a waiter and bartender, testified that before July 31, 1961, he had known the defendant for five or six years. Between 3 and 4 o'clock in the afternoon on that day he saw the defendant; as far as he could recall it was about 3:45 p.m. The witness was then near the telephone booth at the side entrance of the union hall. The defendant entered the building, appearing to be "in quite a hurry," and went over to the water fountain and drank water. As the defendant left the hall, he said, "God damn that woman." The defendant did not remain in the union hall over a minute and a half at the most. The witness was asked if the defendant appeared to have been drinking or to be under the influence of alcohol, and he replied that he "couldn't say definitely one way or the other." Upon being asked on cross-examination whether, when he entered the union hall, the defendant "looked like he may have been a little panic-stricken," the witness answered, "Well, somewhat, yes." When he saw the defendant a few days before that incident, he was quite sure that the defendant had a cast on his left arm; on July 31, 1961, that arm "seemed to be in sort of a stiff position there."

Harold Kade, M.D., testified that he performed an autopsy upon the body of Mrs. Cooper. His testimony was in part as follows: "The body externally was that of an elderly caucasian female appearing approximately 65 years of age,

and there were injuries evident on the head and face of this person most pronounced.'' He expressed the opinion that the injuries which were visible in the area of the right eye were the result of trauma; the force used could have been a fist. The injury to that area appeared to have occurred prior to death. He further testified that: ''There were abrasions and contusions which are scraped and bruised areas on the surface of the right side of the neck. . . . There was also swelling and puffiness of the skin along the right side of the neck in this area of bruising and scraping. There was a zone of discoloration and swelling in the left occipital area of the scalp which is the left rear portion of the scalp, a quite considerable lump or zone of swelling in that area approximately perhaps 2 to 2½ inches in diameter and located approximately as I indicated in Diagram No. 3.'' The injury to the left occipital region was one that could have been caused by that part of the head striking some hard surface and was more likely to have been so caused rather than to have resulted from a blow from a fist. After testifying at length as to conditions he found with respect to the deep structures of the neck, he expressed the following opinion: ''The cause of death based on the observation of the autopsy and primarily based on my findings of the neck organs were that the cause of death was a result of manual strangulation. . . . My opinion was based on the observation of these particular injuries which are of a characteristic type for pressure exerted on a neck by a hand and can not conceivably result from any other mechanism of pressure or mechanical force. . . . In my opinion this manual strangulation was the result of compression by a right hand rather than a left. . . . Because of the breaking not only of the hyoid bone but also the superior horn of the thyroid cartilage on the right side which indicates pressure from a thumb and that thumb would be applied to the right side of the individual being strangled and, therefore, it would necessarily be the thumb of the right hand. Had it been the thumb of the left hand, why, that pressure would be exerted on the left side of the neck of the individual being strangled.'' Without objection from the defendant's attorney, Dr. Kade further testified that in his opinion ''one hand strangulation occurs far more commonly than two handed strangulation.''

Donald Lynch, a Police Officer for the City of Los Angeles, testified that when the defendant was arrested on July 31, 1961, there was no cast on either of his arms. While being taken to the police building, the defendant made an

unsolicited statement: "The defendant stated, 'I want you to write this in your book. I was at a bar and I went from the bar to my home, where I went directly to the bathroom and from there to my room where I found Alice dead. Her snatch had not been bothered. She had just been strangled.' " The officer smelled no odor of alcoholic beverage on the defendant's breath, but his appearance was such that it was "possible that he had been drinking."

William R. Munkres, a Police Officer for the City of Los Angeles, testified that at approximately 4:10 p.m. on July 31, 1961, he received a telephone call at the police building and then went to a bar at Sixth and Bixel streets. There he saw the defendant who indicated that he was the person who had made the call. As to that telephone call, the officer testified that "a drunken voice informed me that his landlady, or a woman was dead in his room." The officer, together with Officer Ham, arrived at the bar at about 4:30 p.m. and then accompanied the defendant to his room. There they found the body of Alice Cooper on the floor. She was lying on her back; her dress was up near her hips. What appeared to be blood was coming out of the left corner of her mouth. When the officer first saw the defendant he thought that he was drunk, but after he talked to him he came to the conclusion that he was not. The defendant told the officer that after Joe Bagley left his room he had walked around in the neighborhood and then had returned to his room; as he walked over to the closet to get a coat he stepped on Mrs. Cooper's stomach and stumbled into the closet. He picked her up and held her; she was limp. He did not know whether she was drunk or had just passed out in the room. He placed her back on the floor and found that there was no pulse. He then went to the bar and telephoned the police.

At the room Officer Munkres saw a "toy dueling pistol, such as would be found on a cuff link" between the thighs of the body. Upon later inquiry by the officer, the defendant said that he owned a dueling pistol similar to the object, as described to him by the officer, and that he had had it in his possession but he did not know where it then was.

Max Schuckett was called as a witness on behalf of the defendant. On the morning of July 31, 1961, he helped the defendant move his personal property from his former residence. At that time the defendant did not use his left arm. The witness drove him to the union hall, arriving there about 10:30 a.m. Thereafter Mr. Schuckett drove the defendant to

the rooming house and, after the defendant had arranged to rent a room, carried his clothing into the room. The defendant was sober. Mr. Schuckett left between 11:30 a.m. and noon.

A receiving hospital record was placed in evidence which showed that on July 31, 1961, between 10 and 11 p.m. the defendant was examined. Part of the record was as follows: "Opinion and/or Findings: Old injury, possibly fracture of left elbow. Patient removed cast."

The defendant testified on his own behalf. He denied that he strangled Alice Cooper. He said that he had broken his arm on July 20, 1961, and that it had been put in a splint and a partial cast. On the night of July 30, 1961, he had an argument with his wife, and on the next morning she told him he would have to leave the house. That morning he took the cast off his arm. He called the Schucketts and they came over and transported him to the place where he rented a room, stopping first at the union hall. He had never seen Mrs. Cooper before. After discussing with Mrs. Cooper various matters relating to the premises, he left the room and went to the union hall where he did some drinking. Sometime that afternoon he "was beginning to get pretty intoxicated" and he returned to his room with Mr. Smith. Mrs. Cooper came in and asked whether he was sick. Mr. Smith said that he was but that he would be all right. Mrs. Cooper left the room and then Mr. Smith departed. Mrs. Cooper returned and asked him if he had any cooking utensils. She said that she was going to the grocery store and offered to get anything he needed; he requested her to bring back several articles. She later returned from the store and thereafter brought Mr. Bagley to the defendant's door. He and Mr. Bagley drank a bottle of beer and Mr. Bagley left. The defendant went to sleep. When he awoke, he dressed and went to the union hall. Mrs. Cooper was on the front porch as he left the rooming house. She said that if he would leave his door open she would be able to put some pots and pans and towels in the room. Because of his arm, he did not seek a job at the union hall. He left the hall, talked to men gathered outside the building, and then walked around the neighborhood. He stopped in one place to drink beer. When he returned to his room the door was ajar; he had left it partly open when he departed earlier. He entered the room. After he put his shirt "somewhere," he bumped into a drawer and then started toward the refrigerator; at that time he stepped "on this lady." He thought that she was

"either sick or drunk." He spoke to her but there was no answer; he "tried to get her up on her feet," but she was limp and he "laid her back down." He could not feel any pulse. He left the premises, went by the union hall and walked to a bar where he called the police. On cross-examination he stated that he drew the conclusion that Mrs. Cooper had not been sexually molested, as set forth in his statement to Officer Lynch, from the fact that her clothing had not been torn.

Lewis Jack Martoff, called as a witness on behalf of the defendant, testified that on July 31, 1961, he was with the defendant in the union hall "from quarter past 11:00 to 20 minutes past 12:00," talking about union affairs, and that he borrowed two quarters from the defendant.

█ Guilt of the crime of murder may be established by circumstantial evidence. (*People* v. *Reed*, 38 Cal.2d 423, 431 [240 P.2d 590]; *People* v. *Green*, 13 Cal.2d 37, 42 [87 P.2d 821].) █ As stated in *People* v. *Daugherty*, 40 Cal.2d 876 [256 P.2d 911], at pages 885-886: "The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. It is not whether guilt is established beyond a reasonable doubt. . . . █ [T]he rule that the circumstances relied upon by the prosecution must be consistent with guilt and inconsistent with an hypothesis of innocence is a rule of instruction for the jury, and is not the rule for the guidance of the court on review."

█ In the present case, the testimony of the witnesses Smith and Bagley supported the inference that the defendant was in his room for a substantial period of time after 3 p.m. It was a further reasonable inference that Mrs. Cooper was strangled between the time Mr. Bagley left the room and 4 p.m., because the telephone call made by the defendant from the bar was received by Officer Munkres at approximately 4:10 p.m. The jury was not bound to accept the testimony of the defendant as to his actions in the intervening period if they found it not to be worthy of belief, as appears to have been the conclusion of the jurors. The conduct of the defendant in going to the bar to telephone the police after the death of Mrs. Cooper, instead of alerting persons on the premises or nearby, gave material support to the inference that he was the person who committed the homicide, as did his statements as related by Mr. Thorne and Officer Lynch. A review of the evidence shows that it was of the substantial nature necessary to sustain a finding of guilt.

■ The fact that no instruction was given to the jury upon the subject of manslaughter did not constitute error. It was the defendant's position that he did not kill Mrs. Cooper and that he was not in his room when the crime occurred. There was no evidence upon which a conviction of manslaughter could be based. Consequently, the defendant was not entitled to such an instruction. (*People* v. *Zilbauer,* 44 Cal.2d 43, 49 [279 P.2d 534] ; *People* v. *Sutic,* 41 Cal.2d 483, 493-494 [261 P.2d 241] ; *People* v. *Dixon,* 192 Cal.App. 2d 88, 90-91 [13 Cal.Rptr. 277] ; *People* v. *Palmer,* 185 Cal. App.2d 737, 746 [8 Cal.Rptr. 482] ; *People* v. *Johnson,* 105 Cal.App.2d 478, 492 [234 P.2d 116].)

■ The defendant contends that there was error in the exclusion of evidence as to the general reputation of Mr. Thome, a witness on behalf of the prosecution, for veracity.[1] If there was error, it could have been of a prejudicial nature because it is probable that the jury placed substantial reliance on the testimony of Mr. Thome, as related hereinabove, in reaching its verdict. Edmond Anthony, who was a business representative for the waiters' union on July 31, 1961, was called as a witness on behalf of the defendant and testified that, during the time he had been a union representative, members had discussed Mr. Thome's reputation for "truth, honesty, veracity and reliability" about "a couple of times." The witness was thereafter asked whether he was familiar with Mr. Thome's general reputation for veracity in the community "where he lives or works." The witness replied, "Not the community he lives; in the place of employment where he is booked from our hall." On *voir dire* examination by the deputy district attorney, the witness said that two persons had talked to him at the union hall about Mr. Thome and that his "opinion" was based on that. The court held that there was an insufficient foundation for testimony by the witness as to general reputation because "[y]ou can't get a general reputation by talking to two people."

It is stated in Witkin, California Evidence, section 653, at page 695, as follows: "The modern trend, however, is to permit evidence of reputation in business circles in proof of character, upon a proper foundation showing that the person had acquired a general reputation in those circles." (See

---

[1]Section 2051 of the Code of Civil Procedure is in part as follows: "A witness may be impeached by the party against whom he was called . . . by evidence that his general reputation for truth, honesty, or integrity is bad, . . ."

also *People* v. *Cobb,* 45 Cal.2d 158, 163-164 [287 P.2d 752].) What is sought is not what a few persons say or think about another person, but what is generally believed about him with respect to the particular trait of character. (See *Moore* v. *United States,* 123 F.2d 207, 210.) Thus, in *People* v. *Root,* 112 Cal.App.2d 122 [245 P.2d 679], where a witness, who was called by the prosecution in rebuttal of evidence of the good reputation of the defendant for morality, testified on *voir dire* examination that he had discussed the defendant's morality with only two persons, Mr. Justice Dooling said at pages 127-128: ''Such testimony must be of the general reputation, '(h)ence the witness to such reputation must, at least, be acquainted with the prevailing impression in the community, as disclosed by actions, conduct, or conversations relating to the character in issue, although it is not necessary that the witness testifying should know that the majority of the community have that impression.' (*People* v. *Cord,* 157 Cal. 562, 572 [108 P. 511]; 5 Wigmore on Evidence (3d ed.) §§ 1611-1613, pp. 481-484.) It has been specifically held in other jurisdictions that conversations with no more than one or two persons on the subject are not enough. (*Commonwealth* v. *Rogers,* 136 Mass. 158; *State* v. *Pickett,* 202 Iowa 1321 [210 N.W. 782].)'' In *People* v. *Workman,* 136 Cal.App.2d 898 [289 P.2d 514], it was stated at page 901: ''There seems to be a difference in the foundation necessary to prove *good* reputation from that necessary to prove *bad* reputation. A witness may base good reputation on the fact that he has never heard anything against the person's reputation. On the other hand, a bad report must of necessity have been discussed generally in the community. (See 1 Wharton's Criminal Evidence, pp. 465-466; 5 Wigmore on Evidence (3d ed.) § 1614, pp. 484-486.)''

 Whether a witness is sufficiently qualified to testify as to the general reputation of another is a matter which rests primarily in the discretion of the trial court. The exercise of that discretion will not be disturbed on appeal unless an abuse appears. (*People* v. *Workman, supra,* 136 Cal.App.2d 898, 901.) There was no abuse of discretion in the present case.

The appeal from the order denying the motion for a new trial is dismissed. (See Pen. Code, § 1237.) The judgment is affirmed.

Shinn, P. J., and Files, J., concurred.

A petition for a rehearing was denied April 17, 1963.