[Crim. No. 3623. Third Dist. June 28, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. BARRY MILES SIGAL, Defendant and Appellant.

Allan B. O'Connor for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

REGAN, J.—For the second time Barry Miles Sigal was convicted by a jury of murder in the second degree.[1] He appeals from the judgment.

The victim of the murder, Mrs. Wilma McAfee, was the manager of an apartment house in which defendant resided. He was seen conversing with Mrs. McAfee at the entrance to her apartment about 5:30 p.m., January 11, 1962. About 9:30 p.m. another tenant had a telephone conversation with Mrs. McAfee.

Mrs. McAfee was not seen on January 12. Her daughter attempted to enter her mother's apartment about 6:30 p.m. but the door was locked. She secured a passkey hidden in a basement room and entered her mother's apartment. She discovered her mother's body covered with a bedspread in a bedroom. Mrs. McAfee had been strangled from behind. There were many bruises and abrasions on her body. The autopsy surgeon testified that death had occurred some 14 to 28 hours prior to 8 p.m., January 12, as the result of asphyxiation. There were no indications that entry into the apartment had been gained by means of force. There was no evidence of a struggle in the apartment. A master key which Mrs. McAfee kept on a long chain was missing, though the chain was found near her body. Her car keys were missing and her car could not be found in the area.

On January 12 Sigal's apartment was searched. A hall light was lit, dirty dishes were found in the sink and on the dining table, the bed was not made, and clothing was found in

<hr>

[1]For a report of the first case see *People* v. *Sigal,* 221 Cal.App.2d 684 [34 Cal.Rptr. 767].

the closet. Shortly after 6 a.m. on January 15 Sigal was in possession of a car, later identified as Mrs. McAfee's, in Jacksonville, Illinois. He told the attendant of a service station that he was driving the car to Springfield, Illinois. The McAfee car was discovered in a parking lot in Springfield, Illinois, on January 20. The vehicle was covered with 14 inches of snow, which indicated that the automobile had been in the lot since the last snowfall some four or five days before. The doors, which could not be locked without a key, were locked. There was no discernible evidence that the automobile had been "hot wired." Sigal's fingerprints were found on the rearview mirror and on a box of No Doz tablets.

Sigal was arrested in Seattle, Washington, on February 19, 1962. A .45 automatic was found in his hotel room. The weapon was identified as one taken from an apartment in the building where Sigal and Mrs. McAfee resided. The owner discovered that the automatic was missing on January 13. He believed that the gun was taken some time between 3:45 p.m. and midnight on January 11. Sigal had knowledge that the owner possessed such a weapon.

Prior to the first trial Dr. Walter Rapaport, a psychiatrist, was appointed to inquire into Sigal's sanity at the time of trial. He had two conversations with Sigal. In the first conversation Sigal stated that he was in Mrs. McAfee's apartment between 7 and 8 p.m. watching television. Sigal stated the last he could remember was around 8 p.m. that evening. His next realization was that he was in Missouri in Mrs. McAfee's car. In the second conversation Sigal stated that he had never admitted taking the car or that he was in the car or that the car was Mrs. McAfee's.

Sigal did not testify nor was any evidence offered on his behalf.

In his argument the district attorney told the jury that the accused's failure to take the stand and explain or deny the evidence against him permitted the jurors, during their deliberations, to draw inferences more unfavorable to the accused.

The court instructed the jury: "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus, whether or not he does testify rests entirely in his own decision. As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify, the jury may take that failure into consideration as tending to indicate the truth of such evidence

and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable. In this connection, however, it should be noted that if a defendant does not have the knowledge that he would need to deny or to explain any certain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain such evidence. The failure of a defendant to deny or explain evidence against him does not create a presumption of guilt or by itself warrant inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt.

"In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove every essential element of the charge against him, and no lack of testimony on defendant's part will supply a failure of proof by the People so as to support by itself a finding against him on any such essential element."

 Appellant contends that it was improper to receive evidence of the theft of the .45 automatic. " 'It is settled in this state . . . that except when it shows merely criminal disposition [citations], evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged. "The general tests of the admissibility of evidence in a criminal case are: . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people . . . ? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not." ' " (*People* v. *Lopez,* 60 Cal.2d 223, 249 [32 Cal.Rptr. 424, 384 P.2d 16].)

 The evidence was relevant because it permitted an inference that Sigal entered the apartment with a master key before midnight the night of the murder. It also was relevant because it tended to pinpoint the time of Sigal's flight which is a factor which may be considered with the other evidence tending to connect an accused with the commission of the crime. (*People* v. *Moore,* 211 Cal.App.2d 585 [27 Cal.Rptr. 526].) Thus there was no error in its admission.

 Appellant also contends that it was improper to receive the testimony of Dr. Rapaport, relating the defendant's

statement, which placed him in Mrs. McAfee's apartment at 8 p.m. the night of the murder. Dr. Rapaport was appointed under the provisions of Penal Code section 1368 to inquire into Sigal's sanity prior to the first trial.

If the appointment had been made under the provisions of section 1027 of the Penal Code the testimony would have been properly received. The applicable rule of law is stated in *People* v. *Ditson,* 57 Cal.2d 415 (at page 448 [20 Cal.Rptr. 165, 369 P.2d 714]) : "The argument is untenable. 'Merely because the statute [Pen. Code, § 1027] provides that it is the *affirmative* duty of an alienist to testify whenever summoned in a sanity proceeding does not mean or even imply that he is *prohibited* from testifying in other proceedings where information that he may have is relevant and material.' (*People* v. *Combes* (1961) 56 Cal.2d 135, 149 [17] [14 Cal.Rptr. 4, 363 P.2d 4].) Here each of the alienists had questioned Cisneros as to his memory of the events of the night of the crime, such information being necessary to a proper psychiatric determination of whether he had suffered an epileptic seizure on that night preventing him from having the required specific intent to commit first degree murder. Their testimony in this connection was both relevant and material, and hence was admissible on the guilt phase of the trial (see *People* v. *Wells* (1949) 33 Cal.2d 330, 351 [14b] [202 P.2d 53]) whether as part of the People's case in chief (Dr. Smith) or to rebut conflicting medical testimony introduced by the defense (Drs. Dwankowsi and Thompson). Cisneros was not compelled to submit to the psychiatric examination; he did so voluntarily. His contention that this resulted in a violation of his privilege against self-incrimination is without merit, and has recently been rejected by this court (*People* v. *Combes* (1961) *supra,* 56 Cal.2d 135, 149-150; accord: cases collected in note, 32 A.L.R.2d 434, 444-448). There is, of course, no doctor-patient privilege in criminal cases (Code Civ. Proc., § 1881, subd. 4), although at the trial Cisneros appeared to object to the alienists' testimony on that ground as well."

No case that we have found discusses the propriety of receiving the testimony of an alienist appointed under the provisions of Penal Code section 1368 but it would seem that the rules enunciated under the provisions of section 1027 would be controlling. There is no logical reason for admitting such testimony if the psychiatrist is appointed under section 1027 and excluding it if he is appointed under section 1368. If the testimony is admissible in one case, it is in the other. Only

other exclusionary rules would prevent reception. On the record presented here the court properly permitted Dr. Rapaport's testimony.

Appellant urges, however, that Dr. Rapaport's testimony failed to meet the foundational requirements of Code of Civil Procedure section 2047. When Dr. Rapaport interviewed appellant, he took notes of his conversations. The notes paraphrased appellant's statements. Admittedly he did not transcribe the entire conversation but the notes stated what he had been told. Dr. Rapaport testified that he had no present recollection of the conversation but at times the use of the notes served as a mnemonic device and he was able to relate statements not included in his notes.

Section 2047 of the Code of Civil Procedure provides: ''A witness is allowed to refresh his memory respecting a fact, by anything written by himself, or under his direction, at the time when the fact occurred, or immediately thereafter, or at any time when the fact was fresh in his memory, and he knew that the same was correctly stated in the writing. But in such case the writing must be produced, and may be seen by the adverse party, who may, if he choose, cross-examine the witness upon it, and may read it to the jury. So, also, a witness may testify from such a writing, though he retain no recollection of the particular facts, but such evidence must be received with caution.''

By this section California permits the recollection of a witness to be revived and also permits the witness to testify from such a memorandum even though he has no present recollection of the facts. (See Witkin, Cal. Evidence (1958) §§ 597, 603.)

The foundational requirements of section 2047 were met. Dr. Rapaport testified that the notes were made at the time of the conversations and they were true and accurate. There was no error in the admission of Dr. Rapaport's testimony. As stated in 3 Wigmore on Evidence (3d ed.) section 755: ''The trial court's discretion should be allowed to control. There should be liberal interpretation and liberal exemption. *And no ruling of admission should ever be deemed an error worth noticing on appeal.*'' (Italics added.)

Appellant further asserts that his second statement made to Dr. Rapaport was improperly received because it was not an admission. In the first conversation appellant declared that the next thing he remembered after 8 p.m. of January 11, was driving Mrs. McAfee's car. In the second conversation

appellant stated that he had never admitted taking the vehicle or being in it. The second in effect was a denial of the first. It is permissible to infer that it was an attempt to negate the previous statement and thus an attempt to suppress the first statement. As such it would be a circumstance indicating consciousness of guilt and admissible. (See 2 Wigmore on Evidence (3d ed.) § 276.)

Appellant also contends that the evidence is insufficient to sustain the conviction. Appellant does not challenge the sufficiency of the evidence except as it connects him with the commission of the crime. ■ Guilt of the crime of murder may be established by circumstantial evidence. (*People* v. *Reed*, 38 Cal.2d 423 [240 P.2d 590]; *People* v. *Paisley*, 214 Cal.App.2d 225 [29 Cal.Rptr. 307].) ■ "The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. It is not whether guilt is established beyond a reasonable doubt." (*People* v. *Daugherty*, 40 Cal.2d 876, 885-886 [256 P.2d 911].) ■ Appellant admitted being in Mrs. McAfee's apartment as late as 8 p.m. He was seen driving her car in Illinois and his fingerprints were found on the rearview mirror and a box of No Doz tablets when the car was located in Springfield, Illinois. The car had been locked, indicating that the person who had taken the vehicle was in possession of the car keys. Appellant was identified as the driver of the car. The car keys which Mrs. McAfee kept in her purse could not be found. There was also evidence that appellant had hurriedly left his apartment, which is also indicative of guilt. The pistol in appellant's possession was taken from an apartment inferably entered by means of Mrs. McAfee's missing master key. There is a chain of circumstances from which the jury could infer that appellant was the person who murdered Mrs. McAfee. This court cannot say that the evidence of appellant's guilt is not supported. (See *People* v. *Paisley, supra.*)

■ However, the judgment must be reversed because of the argument of the district attorney and the instruction of the court concerning the appellant's failure to take the stand. (See *Griffin* v. *California*, 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106].) The case against appellant is not strong. Applying article VI, section 4½ of the California Constitution as we must (*People* v. *Bostick*, 62 Cal.2d 820 [44 Cal.Rptr. 649, 402 P.2d 529]), we think there is " 'such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error has affected the result. . . .' " (*People*

v. *Purvis,* 52 Cal.2d 871, 887 [346 P.2d 22], quoting *People* v. *Watson,* 46 Cal.2d 818, 837 [299 P.2d 243].) Accordingly we find the error prejudicial.

Our remaining discussion will be limited to those questions which may be presented on a retrial. Appellant complains that the trial judge unduly restricted argument of his counsel by refusing to permit him to state the law of circumstantial evidence to the jury.

In the concurring opinion in *People* v. *Reinschreiber,* 141 Cal.App.2d 688, the statement was made (at p. 702 [297 P.2d 658]) : ''The notion that counsel must refrain from ever mentioning any principle of law in argument is a fetish that is often carried to inordinate lengths. Almost all argument is devoted to the matter of the duties of the parties, what they had or had not a right to do, and in criminal cases to the elements of the offense. Instead of instructing the jury before the arguments the court instructs after they are finished. If counsel undertakes to discuss the duties of the parties in, we'll say, a negligence case, and mention familiar provisions of the vehicle code, they are halted and told that the court will state the law. In a criminal case argument is necessarily directed toward the evidence that is relevant to the elements of the offense, and whether those elements have been established. But the jury may have to wait for the instructions to learn what are the elements of the offense. A forceful argument that there was no evidence of an intent to defraud may be regarded as quite irrelevant by a jury that is uninformed that a specific intent must be proved, and to inform them of the fact when the argument is cold and largely forgotten cannot recapture its effectiveness. There is no sense in limiting argument to discussion of the evidence relevant to the rights and duties of the parties while the jury is kept in ignorance as to what those rights and duties are. The jury should be informed as to the essential factual issues under applicable principles of law and appropriate instructions should be given before the arguments. . . .'' (See also *People* v. *Keenan,* 13 Cal. 581, 584; Witkin, Cal. Criminal Procedure (1963) Trial, § 467, pp. 474-475; see also *People* v. *Baldwin,* 42 Cal.2d 858, 871 [270 P.2d 1028] ; *People* v. *Lapara,* 181 Cal. 66, 70 [183 P. 545].)

 While it is for the court to decide questions of law, it may permit counsel to state correct law and to discuss the application of the law to the facts. We believe that in a circumstantial evidence case the court should be liberal

in permitting counsel to argue the facts to the law though its refusal is not error. (See *People* v. *Chessman,* 38 Cal.2d 166, 188 [238 P.2d 1001].)

No other points require discussion.

The judgment is reversed.

FRIEDMAN, J.—I concur in Justice Regan's opinion. The reasoning and the result are entirely correct by the standards of criminal justice which control us all. I deem it necessary, however, to express my strenuous protest against enforced participation in the archaic and socially dangerous machinery which California law maintains for handling cases like this. Barry Sigal has been twice tried and his conviction twice reversed. No one can read the record without a strong belief that he murdered Wilma McAfee. There is in the record some intimation that this defendant is emotionally disturbed, seriously so. Lodged with the trial court and attached to the record on appeal is the written statement of a licensed California psychiatrist who has known and treated Barry Sigal since boyhood. (See *People* v. *Sigal,* 221 Cal.App.2d 684, 697, fn. 2 [34 Cal.Rptr. 767].) The psychiatrist reported signs of mental deviation when the boy was 12. During Sigal's service in the Marine Corps, he spent time in a psychiatric ward. On the basis of Sigal's history and an examination made in May 1962, the psychiatrist states:

"1. Barry Sigal is mentally abnormal, and has been for many years.

"2. He has delusions of grandeur associated with persecutory and paranoid feelings.

"3. His emotional responses and moods are inappropriate to the subjects and their importance.

"4. His reactions are compulsive in many instances and situations and are indeterminate and unpremeditated.

"5. His interests and emotional emphasis are upon immediate sensory satisfactions rather than upon realities.

"6. He has only a fleeting concept of the seriousness of his present position, principally because he cannot differentiate between phantasy, imagination, and reality.

"7. If he commited the crime for which he is presently charged he could not have been normal mentally at the time."

This second reversal may be a step on Barry Sigal's road to freedom. No judge would willingly participate in this step without first ascertaining whether he is a compulsive offender

and a danger to the community. No judge would participate in such a step without a deep sense of protest. It is this sense of protest which I voice.

The law faces three alternatives here: If Barry Sigal did not kill Mrs. McAfee, he should go free. If he did kill her and is responsible for his act, he should go to prison. If he killed her and his act was the product of mental illness, he should be confined in a mental institution. Is it not logical, is it not rational, that the machinery of the law should pause to investigate this third alternative? Will Sigal go free, possibly to deal with others as he apparently dealt with Mrs. McAfee? Should not the law, in all its majesty and assumed rationality, deal with this possibility before it is too late? Why must we captives of the law go through the motions of trying him as though there were no suspicion of mental illness in his history? We are like sleepwalkers caught up in a meaningless ritual dance.

At one point Sigal's counsel entered and withdrew a plea of "not guilt by reason of insanity." If the withdrawal occurred because the plea had little hope or meaning, counsel was probably right. The California concept of criminal insanity is an ineffectual tool here. With a slight verbal modification, it stands on the "right from wrong" test pronounced in the *M'Naughton* case in 1843.[1] (*People* v. *Wolff*, 61 Cal.2d 795, 800-803 [40 Cal.Rptr. 271, 394 P.2d 959].) The *M'Naughton* rule simply does not answer the problem posed by the mentally ill offender who acts under the compulsion of uncontrollable impulse. One realizes with a sense of shock that California law still holds an offender to full responsibilitiy even though he acted under the compulsion of an irresistible psychotic impulse. (See CALJIC No. 806.)

A world of psychological knowledge has been revealed to us since the turn of the century. Giants such as Freud, Adler and Jung have handed us new insights and new tools. There is no logical reason why, in our treatment of the compulsive offender, we insist on narrowing our vision to a legal epigram pronounced in 1843. Concededly, this epigram has its supporters and possesses a certain efficacy. The point here is that it is by far too narrow.

In worrying over the safety of the community, we derive scant consolation from the proposition that the *M'Naughton* rule is not so obsolete as to force judicial abandonment. (See *Leland* v. *Oregon*, 343 U.S. 790; *People* v. *Wolff*, *supra*, 61

[1] *Queen* v. *M'Naughton* (1843) 4 St.Tr. (N.S.) 847, 931; *M'Naughton's Case* (1843) 10 Clark & F. 200, 210, 8 Eng. Reprint 718, 722.

Cal.2d 795.) It is equally comfortless that arguments are possible and the psychiatric alternatives not utterly certain. (See Diamond, *Criminal Responsibility of the Mentally Ill,* 14 Stan.L.Rev. 59; Nutter, *A Change in the Rules of Criminal Responsibility?* 39 Cal.St.Bar J. 101; Thomas, *The Dangerous Offender,* 14 Syracuse L.Rev. 576; Weintraub, *Criminal Responsibility: Psychiatry Alone Cannot Determine It,* 49 Am. Bar Assn.J. 1075.) To debate in terms of "treatment" versus "sanctions" gets us no closer to morality or social safety. If treatment of a "sick" person were the prime objective, then the District Attorney of Sacramento County could await the weary conclusion of criminal proceedings (which have already occupied three years), then apply for the defendant's civil commitment under the Welfare and Institutions Code. That kind of commitment falls far short of the community's needs. The central need here is the community's protection against the potential of future outbursts of homicidal mania. A civil commitment does not entail obligatory security standards. Such standards are available in a state prison. On the other hand, a prison sentence without a prior determination of the defendant's moral responsibility engenders considerable moral discomfort. Guilt and responsibility being facets of the same question, the law is ill conceived when it forces the courts to adjudicate guilt without inquiry into responsibility. (See Louisell and Hazard, *Insanity as a Defense: The Bifurcated Trial,* 49 Cal.L.Rev. 805.)

With all deference to better qualified advocates, I think we should replace or supply alternatives to the *M'Naughton* rule and abandon the bifurcated trial system, which only chops an indivisible human problem into separate procedural pieces. I question also whether inquiry into mental illness should be barred simply because the defendant chooses to avoid it. The problem has been placed squarely in the lap of the Legislature. (See *People* v. *Wolff, supra,* 61 Cal.2d 795; Special Commissions on Insanity and Criminal Offenders First Report, July 7, 1962, and Second Report, November 15, 1962.) Cases such as this demonstrate that the need for solution is too acute to permit protracted debate.

PIERCE, P. J.—I concur in both opinions and agree with all of the views expressed by each of my colleagues. Irresistible, however, is the desire to add my own bit of composition.

I agree that civil commitment under the provisions of the Welfare and Institutions Code (§ 5000 et seq.) falls short of

the community's needs. I believe that inadequacy in the "commitment" provisions (§§ 5000-5607) is less grossly apparent than elsewhere As I read them, these sections permit commitment and provide for safekeeping of dangerously mentally ill persons rather adequately, at the same time protecting the constitutional rights of the assertedly mentally ill. (No doubt legislative *implementation* of the provisions for the safekeeping *and* treatment of the criminally mentally ill is needed.)

It is in the provisions relating to the discharge of such persons that the existing law is woefully inadequate. Under Welfare and Institutions Code section 6728 the superintendent of a state hospital may discharge any patient who, in his judgment, has recovered. Under section 6730 the superintendent may also discharge any *unrecovered* patient whose discharge "*in the judgment of the superintendent,* will not be detrimental to the public welfare." (Italics added.) This, in my judgment, in the case of a mentally ill person who has once demonstrated that he is dangerous to society by an act of violence, is too broad a power to be vested in any one administrative officer, however conscientious and skilled he may be.

The inadequacy of the present law, however, should not, as I view it, stay the hands of the district attorney, unable to prove insanity under the *M'Naughton* rule, and unable to establish guilt in a criminal trial (under rules and constitutional guaranties wisely designed for the protection of sane accused) from seeking commitment of persons known to be dangerously mentally ill. Imperfect as they may be, the existing civil commitment laws, enacted to protect society against dangerously mentally ill persons, should be used; in fact, as I see it, it is the duty of public peace officers to use them. Section 5047 provides such officers "may" petition the court for the commitment of such persons. I would interpret the "may"—when applied to any public officer having knowledge that an apparently dangerous mentally ill person is at large—as meaning "shall."

Respondent's petition for a hearing by the Supreme Court was denied August 25, 1965. Mosk, J., did not participate therein. Schauer, J.,* was of the opinion that the petition should be granted.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.