[Crim. No. 357. Fifth Dist. Sept. 1, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. ARTHUR LEE PARTIN, Defendant and Appellant.

Ronald L. Ruiz for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Raymond M. Momboisse and Anthony S. Dick, Deputy Attorneys General, for Plaintiff and Respondent.

CONLEY, P. J.—Arthur Lee Partin, more than 21 years of age, was convicted on two counts of violation of section 11532 of the Health and Safety Code for selling marijuana to Christopher Robert O'Neil, aged 16 years, on two occasions. He was sentenced to state's prison on each count for the term prescribed by law, with the sentences to run concurrently.

The evidence for and against the defendant adduced respectively by the prosecution and the defense was sharply conflicting. Unquestionably, there was perjury on one side or the other. This court cannot retry the case, or test the

accuracy and good faith of the witnesses. Neither is it necessary to prove guilt in this court to a moral certainty and beyond all reasonable doubt. That is a rule controlling the jury's deliberations; but here, the only permissible inquiry is whether there was substantial evidence to support the verdicts returned by the triers of fact. (*People* v. *Daugherty*, 40 Cal.2d 876, 885 [256 P.2d 911]; *People* v. *Hillery*, 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Paisley*, 214 Cal.App.2d 225, 231 [29 Cal.Rptr. 307].)

The testimony for the People, if accepted, as it was, by the jury, was amply sufficient to support the convictions. Christopher O'Neil, a 16-year-old high school boy, testified that in December of 1965 the defendant sold him a match box full of material similar in appearance to "green tobacco" with seeds in it, which he stated to be marijuana. The alleged place of sale was the residence of the Murphy family on Oakwood Drive in the City of Modesto. When O'Neil smoked the contents of the box, he became "high"; the effect was similar, he said, to intoxication from alcohol. Again, early in January 1966, according to O'Neil's testimony, he returned to the Oakwood Drive residence, and at that time appellant sold him three match boxes full of the same substance for $10. He testified that he later sold one of these boxes to Bill Sanguenetti, a school boy friend, and this box was traced to Bernard Galloway, still another high school student, who had given Sanguenetti $5 to secure such a box.

O'Neil participated in smoking what was in the other boxes, which he bought on the second occasion. He testified that he had smoked marijuana before the first purchase, and it was his opinion that what he bought from appellant and smoked was marijuana.

Reactions and acquired knowledge from the use of a drug such as marijuana qualify a witness to testify that what he later used was the forbidden drug. (*People* v. *Candalaria*, 121 Cal.App.2d 686, 690 [264 P.2d 71]; *People* v. *Winston*, 46 Cal.2d 151, 155-156 [293 P.2d 40].) It should be noted that no objection was made to young O'Neil's statement of opinion that the substance in question was marijuana.

With respect to the "green tobacco" bought by Bernard Galloway, he smoked the contents of the box, but saved the seeds, placing them in a cellophane bag which he left at his home and which his mother knew about. When the investigation developed, his mother delivered the sack of seeds to a law enforcement officer at his request and it was afterwards

properly tested chemically and proved to be marijuana as shown by the evidence of Robert J. Kvick, the state chemist. Thus, there was substantial technical evidence confirming the testimony of young O'Neil with respect to the nature of the substance sold to him by the appellant.

The defendant raises a long series of objections to the judgment, the most weighty of which is the claim that the trial court deprived the appellant of a fair trial by alleged prejudicial misconduct during the hearing of the case. This contention is stressed at the outset by quoting the trial judge's statement made after the verdicts were in and the case concluded insofar as the jury was concerned. Obviously, this utterance in itself, whether true or false as a whole or in its several parts, could not constitute misconduct affecting the trial; we assume that the appellant's counsel quoted it as indicating that the judge was prejudicially unfair in what he had said during the trial itself. The judge's statement made after the completion of the jury's work was as follows: ''Ladies and gentlemen, this concludes your part of the case, and I want to make these observations if I may. You are now discharged from your task in the matter. I want to say right now at least in my judgment, it has no bearing on it at all, but I wholeheartedly concur in your verdict. As a matter of fact I was so concerned about it that I almost took the very rare responsibility that a trial judge has in commenting on the evidence, and to comment. The comment that I intended to make was to merely suggest to you that from the nature of the offense charged against the Defendant in this case, there is rarely a case in which a buyer of a narcotic willingly wants to come in and testify against the seller. I think you were discerning in that very fact, that the young boys were involved, and I think also while the case now is over with, that it must be apparent to all of you as it is apparent to this Court, that there is no crime in the State of California that is quite as serious as this particular offense, and I think that you are all aware of this. I commend you very much for what I think was a very discerning verdict. You have finished your task in the matter. It is a hard task for everyone, but a vicious, dirty, rotten business that I think you all know. Thank you very much for your verdict. You are now discharged.''

▉ A judge is not forbidden to make a comment to the jury, after it has returned its verdict, as to whether or not he agrees with its conclusion. There are not many people who

would have the same opinion as the judge "that there is no crime in the State of California that is quite as serious as this particular offense," but the court's moral judgment is not at issue, and the judge was entitled to his own opinion if that opinion did not twist his objective duty during the trial as the presiding judicial officer.

We must turn back to the transcript of proceedings before the jury. ■ In doing so, we should keep in mind that a judge trying a case has the duty to speak up when it seems apparent to him that there is something about the testimony of a witness in a trial that should be clarified by a reasonable supplementary examination. (*People* v. *Baldwin*, 223 Cal. App.2d 720, 731 [36 Cal.Rptr. 40]; *People* v. *Rigney*, 55 Cal.2d 236, 241 [10 Cal.Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 186]; *People* v. *Ashley*, 42 Cal.2d 246, 274 [267 P.2d 271]; *People* v. *Butterfield*, 40 Cal.App.2d 725, 731 [105 P.2d 628]; 48 Cal.Jur.2d, Trial, §§ 385, 386, pp. 391-395.) Of course, as stated in *People* v. *Huff*, 134 Cal.App.2d 182, 187-188 [285 P.2d 17], a judge "should be careful not to throw the weight of his judicial position in a case, either for or against the defendant.

Many of the witnesses in the present case were evasive, reluctant, or vague. It is our viewpoint that the state of the record justified the trial judge's attempts to obtain clear and truthful responses. (*People* v. *Saunders*, 13 Cal.App. 743, 748 [110 P. 825]; *People* v. *Lopez*, 164 Cal.App.2d 346, 349 [330 P.2d 450]; *People* v. *Miller*, 41 Cal.App.2d 252, 258 [106 P.2d 239]; *People* v. *Darby*, 114 Cal.App.2d 412, 437-438 [250 P.2d 743].)

The 16-year-old Christopher O'Neil had testified fully with regard to the purchase from the appellant of marijuana on two occasions and he had pointed out the defendant, Partin, as he sat near his attorney in the courtroom. The following then took place:

"THE COURT: All right. Let me ask you a question, you see Mr. Partin here, the man sitting on the right of Counsel?

"THE WITNESS: Yes sir.

"THE COURT: Is this the man in December that sold you a match box for $5.00 at his place?

"THE WITNESS: Yes, sir.

"THE COURT: Is he also the man that sold you three match boxes in January for $10.00 at the place where he lives here in Modesto?

"THE WITNESS: Yes, sir.

"THE COURT: All right. Fine. That's all. You may step down."

The use of the word "fine" appears to have been a verbal idiosyncrasy of the judge presiding. There are three instances in the record where he used the expletive after questioning a witness, and it would seem that the meaning was "You have completely answered my question," and that it was not intended to, and did not, express approval of the testimony just given by the witness. We cannot see that the specific answers made by the 16-year-old boy to the judge's questions did more than clarify what he had already testified to in identifying the defendant. While this additional testimony might not have been essential in view of the earlier evidence given by the alleged minor purchaser of marijuana, we do not believe that any prejudice resulted.

The witness, John Zakarian, was called to the stand by the state. He was, obviously, a most evasive and reluctant witness. At the beginning of the trial, he had been excluded from the courtroom with other witnesses upon motion of the defendant, and he, consequently, did not hear Christopher O'Neil testify that he had left the three match boxes which he purchased in early January in Zakarian's desk drawer and that he later removed them. Zakarian denied that he knew of any such actions on O'Neil's part. The following then occurred:

"THE COURT: Mr. Zakarian, let me ask you, sir, now, if I heard your testimony correctly—so you will know—there has been testimony in this trial by Mr. O'Neil that he came to your home and that he had three match boxes and he placed them in a drawer of some kind in your home.

"THE WITNESS: (Affirmative nod of head).

"THE COURT: I want you to know that this is the substance of what he has testified to . . .

"THE COURT: Now, you answer the question. Did he or not? Did he ever come to your house and ever at any time place any match boxes in your desk drawer? I won't ask you if you knew what was in them at all. I want to know if he ever did that?

"THE WITNESS: Not to my knowledge."

Sometime after this passage, Zakarian admitted that it was possible that O'Neil could have come to his house and put something in one of the drawers in his desk and removed it several days later without his knowledge. It was, of course, an irregular thing for the court, after excluding the witnesses, to state to one of them that O'Neil had testified contrary to his

present evidence with respect to leaving the match boxes in Zakarian's drawer. However, it should be noted that the court's statement as to what O'Neil had said did not precede Zakarian's initial testimony and that the court was apparently attempting to get at the witness's version of the truth by calling attention to the fact that a previous witness had testified quite to the contrary of what he was then saying. It is, of course, the duty of a presiding judge to use reasonable means to attempt to elicit the truth, and it should also be noted that the witness persisted in his answer to the judge's query that O'Neil had done nothing of the kind to his knowledge. The following also took place at one point in Zakarian's cross-examination:

"Q. [MR. HINTON] This Oakwood address is where the Murphys live? You're familiar with that house?

"A. I know the house. Yes.

"Q. Now, I'll ask you to think for a minute and do you recall whether or not you have ever seen Mr. Partin there or in front of that house?

"A. I'm not sure. I think so.

"THE COURT: You what?

"THE WITNESS: I'm not sure.

"THE COURT: And what else did you say?

THE WITNESS: I said 'I think so.' It's nothing that I can be——

"THE COURT: Try to speak a little louder if you will. It's hard for them all to hear, if you will, please.

"THE WITNESS: Yes, sir.

"MR. HINTON: Q. All right. Again I'll ask you to think a minute. Do you ever recall any occasion when you talked to Mr. Partin when Mr. O'Neil was present either at the Oakwood address or any other place?

"A. I can't recall the specific occasion. I don't know."

Again, after a long examination by both counsel, the following took place:

"THE COURT: Mr. Zakarian, let me ask you, sir, from what I understand from your testimony can you tell us now, did you ever see Mr. Partin over at the Oakwood house?

"THE WITNESS: Yes.

"THE COURT: You have seen him over there. Is that correct?

"THE WITNESS: (Affirmative nod of head.)

"THE COURT: Have you ever seen him over there when you were in the company of anybody else?

"THE WITNESS: Yes.

"THE COURT: At the Oakwood house? Is that correct?

"THE WITNESS: Yeah.

"THE COURT: As best you can recall?

"THE WITNESS: As best I can recall.

"THE COURT: And as far as the specific occasion, you don't know. Is that so?

"THE WITNESS: Yes.

"THE COURT: Do I understand that you have seen this man on several occasions prior to the time that you left here? Is that so?

"THE WITNESS: Yes.

"THE COURT: And you were on a speaking acquaintance basis with him at least. Is that correct?

"THE WITNESS: Yes.

"THE COURT: And he knew who you were and you knew who he was?

"THE WITNESS: Yes.

"THE COURT: And you regard him somewhat of a friend, do you?

"THE WITNESS: Reasonably so. Yes.

"THE COURT: Pardon?

"THE WITNESS: Reasonably so. Yes."

In view of the attitude and the answers of the witness, it would seem that the trial judge was within his rights in attempting to have the witness speak finally and specifically with respect to his acquaintanceship with Partin.

While individual judges might well have had a differing conception of their role as the presiding officer at the trial, it is our conclusion that no prejudicial injury was done to the defendant by the participation of the trial judge in the examination of witnesses, and that it cannot reasonably be contended that the appellant was deprived of a fair trial by anything that the judge said during the course of the hearing.

In view of the questioning of some of the witnesses by the trial judge, the appellant contends that the court, on its own motion, should have given an instruction in the exact words of CALJIC No. 7-A (New) as to how they should consider anything the judge might have said or done in the examination of witnesses. As a matter of fact, the court did give a general instruction on the subject, which we believe was sufficient, particularly in view of the failure of the defendant to propose an instruction in different wording; it was as follows:

"The function of the jury is to determine the issues of fact

that are presented by the allegations in the information filed in this court and the defendant's plea of 'not guilty.' This duty you should perform uninfluenced by pity for a defendant or by passion or prejudice against him. You must not suffer yourselves to be biased against a defendant because of the fact that he has been arrested for this offense (these offenses), or because an information (indictment) has been filed against him, or because he has been brought before the court to stand trial. None of these facts is evidence of his guilt, and you are not permitted to infer or to speculate from any or all of them that he is more likely to be guilty than innocent.

''Therefore in determining the guilt or innocence of the defendant you are to be governed solely by the evidence introduced in this trial and the law as stated to you by the court. For such purpose the law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the People and the defendant have a right to demand, and they do demand and expect, that you will conscientiously and dispassionately consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict (as to each count charged), regardless of what the consequences of such verdict may be. Such verdict must express the individual opinion of each juror. You are not to take cue from court.

''You are the exclusive judges of the facts and of the effect and value of the evidence, but you must determine the facts from the evidence produced here in court.''

▇ Of course, a trial court owes a duty to give instructions on the general principles of law applicable to a given criminal case, even though not specifically requested to do so by the parties, but it is not necessary to instruct on specific points developed at the trial unless requested. (*People* v. *Wade*, 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Allison*, 245 Cal.App.2d 568, 572-573 [54 Cal.Rptr. 148].) ▇ If a party in a criminal case does not request additional instructions, or an instruction clarifying principles set forth in those given, a complaint such as the present one cannot be urged for the first time on appeal. (*People* v. *Robinson*, 180 Cal.App.2d 745, 752 [4 Cal.Rptr. 679]; *People* v. *Lombardi*, 205 Cal.App.2d 803, 805 [23 Cal.Rptr. 325].)

▇ The appellant also contends that the court should have given a cautionary instruction in somewhat the same language as CALJIC No. 510 to the effect that a charge such

as the present one "is easily made, and once made, difficult to disprove," and that the law requires the jury to "examine the testimony of the prosecuting witness with caution." (See *People* v. *Sutton,* 231 Cal.App.2d 511, 515 [41 Cal.Rptr. 912] ; *People* v. *McGhee,* 123 Cal.App.2d 542 [266 P.2d 874] ; *People* v. *House,* 157 Cal.App.2d 151, 156 [320 P.2d 542].) This cautionary instruction is required in sex cases where charges are easily made and difficult to disprove (see *People* v. *Merriam,* 66 Cal.2d 390, 395 [58 Cal.Rptr. 1, 426 P.2d 161]), but, so far as we are informed, it has never been necessary in narcotics cases or the trial of other crimes defined in the Penal Code.

The appellant next contends that the cross-examination of the witness, William Sanguenetti, was unduly restricted. He testified under direct examination that Bernard Galloway had given him $5 to pay in turn to O'Neil for a match box of marijuana. On cross-examination, Sanguenetti testified that he had told Officer Donalson that he did not know where to buy marijuana and that he had never picked up any of it for friends. On the other hand, the witness O'Neil had testified that Zakarian, on occasion, had obtained marijuana from Sanguenetti. Defense counsel then asked Sanguenetti on cross-examination:

"And were you, sir, prosecuted as a juvenile for your participation in this?

"MR. HINTON [Deputy District Attorney] : I object. It's irrelevant.

". . . .

"THE COURT: I'll sustain—I'll allow you to re-ask the question and rephrase it."

The purpose of this line of cross-examination was the attempt to show that Sanguenetti had been promised immunity, or special consideration, in connection with the commission by him of a narcotic offense. However, this angle of inquiry was permitted in the cross-examination:

"MR. STONE: Q. I'll ask this: Were you promised any type of immunity or any type of consideration if you were to testify, if you would testify, if you would make a statement concerning this case or if you would testify concerning this case?

"A. No, sir.

"Q. You were not? A. No, sir.

"MR. STONE: I have no further questions."

Although the question to which the objection was sus-

tained might well have been asked as a preliminary to the ultimate inquiry, the necessity therefor was eliminated through the asking of the direct question with regard to immunity, or other consideration, and the specific negative answer of the witness was not questioned by any evidence produced by the defense, or by any offer of proof. The error, if any, was slight and immaterial, in view of the actual later developments.

It is next suggested by the appellant that there was not sufficient evidence of the composition of the "green tobacco" contained in the wooden match box, in proof of the first count. We have already discussed the testimony of O'Neil with respect to his description of the contents both in appearance and effect and his opinion of what the match box contained. He also said that it was identical with the substance in the three match boxes later purchased, and the contents of one of those match boxes were tested by the state chemist and found to be marijuana. The case of *People* v. *McLean*, 56 Cal.2d 660, 662-663 [16 Cal.Rptr. 347, 365 P.2d 403], is relied upon by appellant, but the evidence in the present case is more specific and, consequently, more convincing than the testimony in the *McLean* case.

The conviction on count 2 is next attacked on the theory that there was not proper proof of the contents of the envelope, which was received from Mrs. Galloway and chemically tested. As is correctly said in *People* v. *Riser*, 47 Cal.2d 566, 580 [305 P.2d 1] (disapproved on another point in *People* v. *Morse*, 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]) : "Undoubtedly the party relying on an expert analysis of demonstrative evidence must show that it is in fact the evidence found at the scene of the crime, and that between receipt and analysis there has been no substitution or tampering. . . ."

The record indicates that the marijuana seeds passed through many hands—from O'Neil to Zakarian, from Zakarian to Sanguenetti, from Sanguenetti to Galloway, from Mrs. Galloway to Officer Donalson, from the police officer in charge of the locked exhibit room at police headquarters to Officer Houck and from him to State Chemist Kvick. It is, of course, not impossible, though practically unthinkable in the light of common sense, that somewhere along the line actual marijuana seeds were substituted for something else originally bought by O'Neil, but it is not at all likely that any such transfer took place. As is said in *People* v. *Riser, supra,* 47

Cal.2d 566, 580: "The burden on the party offering the evidence is to show *to the satisfaction of the trial court* that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration." (Italics added.)

The jury had the duty, in the circumstances presented by the evidence, to determine whether the marijuana tested by the state chemist was in fact the substance bought by O'Neil.

 Lastly, it is urged that the district attorney was guilty of prejudicial misconduct by asking Detective Houck whether he had advised Partin of his rights, with the answer by the witness, "I advised him of his right to remain silent, his right to consult an attorney before making any statements to us, and I also advised him that anything he did say could be used against him in court." The rather strained contention of appellant is that, although there was no testimony with respect to any admission or confession by Partin, the district attorney deliberately solicited this quoted evidence to lead the jury to believe that if Partin did not make any admission or confession it was because it would have been adverse to him and, consequently, that he had a consciousness of guilt. This, it seems to us, is farfetched. It may be that the district attorney did intend at that moment to introduce evidence of some statement made by Partin and that he later decided not to do so, or it may be that the district attorney wanted to show that the defendant was treated considerately and with a consciousness of his rights. We do not believe that any prejudicial misconduct was involved.

The judgment is affirmed.

Stone, J., and Gargano, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 25, 1967.